AARON D. LOVAAS, ESQ. SBN 5701
Aaron.Lovaas@ndlf.com
NEWMEYER & DILLION LLP
3800 Howard Hughes Pkwy, Suite 950
Las Vegas, Nevada 89169
Telephone: (702) 777-7500
Facsimile: (702) 777-7599

EVAN D. MAYO, ESQ. VBN 89383
*(LR IA 11-2 compliance within 14 days)*
evan@mayolawgroup.com
MAYO LAW GROUP PLLC
425 Locust Ave., Suite 201
Charlottesville, Virginia 22902
Telephone: (434) 951-2222
Facsimile: (434) 951-0666

Attorneys for Plaintiff PERRONE ROBOTICS, INC.

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| PERRONE ROBOTICS, INC., <br><br> Plaintiff, <br><br> v. <br><br> REGIONAL TRANSPORTATION COMMISSION OF SOUTHERN NEVADA, <br><br> Defendant. | Case No. <br><br> **COMPLAINT** |

COMES NOW the Plaintiff, Perrone Robotics, Inc. ("PRI"), by counsel, and moves this Court for judgment against Defendant Regional Transportation Commission of Southern Nevada based on the following facts.

## **INTRODUCTION**

1.      This claim arises out of a contractual engagement between PRI and the Defendant. Defendant failed to pay PRI for work performed and refused to provide a meaningful description of what PRI would need to accomplish to be paid.

/ / /

2.     PRI is an autonomous vehicle manufacturing and upfitting company. Defendant engaged PRI to install its autonomous vehicle package (the "TONY Kit") on four (4) of Defendant's transit vehicles to run on predetermined routes in the City of Las Vegas.

<strong><u>PARTIES</u></strong>

3.     PRI is a Delaware stock corporation with its principal place of business in Albemarle County, Virginia.

4.     Defendant Regional Transportation Commission of Southern Nevada ("RTC") is a political subdivision of the State of Nevada within the meaning of NRS 41.0305. This Court has personal jurisdiction over RTC based upon the following: (a) RTC is the transportation-planning agency for Southern Nevada and maintains its executive offices in Las Vegas, Nevada and (b) RTC was created by statute passed by the Nevada Legislature in 1965.

<strong><u>JURISDICTION AND VENUE</u></strong>

5.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum of $75,000.00, exclusive of interest and costs, and because there is complete diversity of citizenship between the parties.

6.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or acts giving rise to the claims occurred in this District.

7.     The Contract between the parties at issue here designates that Defendant may opt for any claim under the Contract to be brought either in this Court or through arbitration. By letter dated January 13, 2025, Defendant opted for the jurisdiction of this Court.

<strong><u>FACTS</u></strong>

8.     The Defendant is a regional entity that oversees public transportation, traffic management, roadway design, and transportation and regional planning efforts in Southern Nevada. RTC allocates funding provided by the Federal Transit Administration and other federal transportation and roadway programs.

/ / /

NEWMEYER
DILLION

9.      On April 16, 2024, the RTC issued Request for Proposals No. 20-014AV, GoMed Autonomous Vehicle Technology Project (the "RFP"). The GoMed Autonomous Vehicle Technology Project (the "Project") is an advanced mobility program designed to deploy emergent technologies to create safer and more efficient ways for people to travel to, from, and within the Las Vegas Medical District (LVMD).

10.     In response to the RFP, PRI submitted a written proposal to provide the autonomous vehicle services and products RTC had requested (the "PRI Proposal"). After PRI attended an interview and the RTC's evaluation committee conducted a competitive scoring process of all submitted proposals, RTC determined to award the right to fulfill the needs of the Project to PRI.

11.     Following negotiation between the Parties on contractual terms, the Parties executed a contract governing the services to be provided by PRI pursuant to the RTC's acceptance of the PRI Proposal (the "Contract"). A copy of the Contract is attached as Exhibit 1 and incorporated herein by reference.

12.     Exhibit A to the Contract provided the scope of services PRI was to provide to RTC to complete its portion of the Project and fulfill the terms of the Contract.

13.     Exhibit B to the Contract provided the fee schedule and delivery schedule for the Project. The total not-to-exceed budget for the Contract's base term was $2,392,000.00, which was further divided into sub-budgets labeled 1.1 through 1.10:[1]

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

---

[1] Ex. 1, p. 35 (page references to Exhibit 1 in this Complaint are made to the DocuSign envelope page numbering printed in the top left of each page).

NEWMEYER
DILLION

**EXHIBIT B – FEE SCHEDULE AND DELIVERY SCHEDULE**

The not-to-exceed budget for all services, for the base term of this contract shall be **$2,392,000.00 (Two Million Three Hundred Ninety-Two Thousand Dollars and Zero Cents)**. All costs associated with this contract and any other costs must come in, at, or under the budget amount. Progress payments will be invoiced on percentage complete of each task for work completed the prior month.

DS
B6

| 1.1 | General Conditions | $250,000.00 |
|---|---|---|
| 1.2 | RTC Transit Vehicle Shipping and Logistics | $150,000.00 |
| 1.3 | Equipping/Retrofitting of RTC Transit Vehicles | $575,000.00 |
| 1.4 | Connected Vehicle On Board Units (OBUs) – 4 total | $117,000.00 |
| 1.5 | Autonomous Vehicle (AV) Technology – 4 total | $300,000.00 |
| 1.6 | Integration and Testing of Vehicles | $175,000.00 |
| 1.7 | Training | $75,000.00 |
| 1.8 | Maintenance Support and Warranties – Year 2 | $250,000.00 |
| 1.9 | Maintenance Support and Warranties – Year 3 | $250,000.00 |
| 1.10 | Maintenance Support and Warranties – Year 4 | $250,000.00 |

14.     The Contract also provided a schedule for the delivery of the services PRI was to provide to RTC:[2]



**PRI Begins Work Under the Contract**

15.     Upon execution of the Contract, and once Defendant issued a Notice to Proceed on or about September 24, 2024, confirming that all of the post-award submittals, agreements, and insurance certificates were in place, PRI began to fulfill its obligations under the Contract, i.e. it began procuring parts, mobilizing efforts, and staffing to develop the plans, requirements, and designs required for safe and effective outfitting and operation of the Autonomous Vehicles (the "AVs").

/ / /

_____

[2] *Id.*

16.    Prior to entering into the Contract, PRI communicated the following schedule of payments reflecting their expected billing over the course of the Project.

| Perrone Robotics Payment Item | Amount | Invoice Date | Pay Date | Project Schedule Activities |
|---|---|---|---|---|
| Mobilization | $ 358,800 | 9/16/24 | 10/18/24 | Project Planning, Requirements, Procurement |
| Planned percentage of logistics, general conditions, retrofitting, TONY Kits and OBU technology | $ 147,600 | 10/31/24 | 11/30/24 | Requirements, Procurement, HW/SW Eng Prep |
| Planned percentage of logistics, general conditions, retrofitting, TONY Kits and OBU technology | $ 147,600 | 11/30/24 | 12/30/24 | Procurement, HW/SW Eng Prep, HW Outfitting |
| Planned percentage of logistics, general conditions, retrofitting, TONY Kits and OBU technology | $ 147,600 | 12/31/24 | 1/30/25 | HW/SW Eng Prep, HW/SW Outfitting |
| Planned percentage of logistics, general conditions, retrofitting, TONY Kits and OBU technology | $ 147,600 | 1/31/25 | 3/2/25 | HW/SW Outfitting |
| Planned percentage of logistics, general conditions, retrofitting, TONY Kits and OBU technology | $ 147,600 | 2/28/25 | 3/30/25 | HW/SW Outfitting, Eng Testing |
| Planned percentage of logistics, general conditions, retrofitting, TONY Kits and OBU technology | $ 147,600 | 3/31/25 | 4/30/25 | Eng Testing |
| Planned percentage of logistics, general conditions, retrofitting, TONY Kits and OBU technology | $ 147,600 | 4/30/25 | 5/30/25 | QA |
| Planned percentage of integration, testing and training and vehicle logistics | $ 50,000 | 5/31/25 | 6/30/25 | Ship/Deliver, Mapping |
| Planned percentage of integration, testing and training | $ 50,000 | 6/30/25 | 7/30/25 | Mapping, Field Testing |
| Planned percentage of integration, testing and training | $ 50,000 | 7/31/25 | 8/30/25 | Field Testing, Training |
| Planned percentage of integration, testing and training | $ 850,000 | 8/30/25 | 9/29/25 | Acceptance, Operations Launch, Operations |
| Total | $ 2,392,000 | | | |

17.    Because the Contract is a fixed price agreement, PRI endeavors to provide up front and predictable billing to its clients that reflects the price allocation to various tasks and milestones. Under the terms of the fixed price contract, PRI was only entitled to bill for work actually performed and this schedule reflects the allocation of that work over time.

18.    Under the contract terms, PRI was entitled to a mobilization payment of three hundred fifty-eight thousand eight hundred dollars ($358.800) at the start of the contract. PRI invoiced this amount upon receiving the Notice to Proceed and despite some pushback from the Defendant, Defendant ultimately paid this invoice on October 17, 2024.

/ / /

NEWMEYER DILLION

19.    PRI continued work on the Project throughout October 2024 in accordance with the agreed upon project schedule contemplated by the Contract. As noted above, this involved the procurement of parts for the AVs, planning, and design work to prepare the Tony Kit for integration with the Defendant's vehicles and foundational tasks for route mapping and other critical systems.

20.    On or about November 6, 2024, PRI submitted its second invoice under the Contract, requesting the agreed upon payment of one hundred forty-seven thousand six hundred dollars ($147,600). Defendant's project team approved the invoice for payment internally but changed course at the last minute and informed PRI that they would refuse payment of the invoice on or about November 13, 2024.

21.    Defendant's reason for withholding payment, as verbally conveyed to PRI by Defendant's project team, specifically, Jesus Marmolejo, was that Defendant's Deputy CEO had withheld the payment because they believed that PRI had "been paid enough for now" and that the Defendant *might* be willing to make a payment for nine thousand three hundred seventy-five dollars ($9,375) for shipping but no more. Furthermore, PRI engaged in numerous verbal communications to try and resolve the matter with Defendant. On information and belief, Defendant asked PRI to communicate on such matters verbally rather than in email in part because such correspondence would be subject to a public records request.

22.    Despite Defendant's failure to dispute any of the work performed by PRI contained on the invoice, insinuating that Defendant's reason for refusing payment was not tied to the actual work performed or the form of the invoice, PRI attempted to rectify the situation by re-submitting a revised version of the October invoice on November 14, 2024, attempting to address the purported issues with the initial invoice.

23.    This second invoice was again rejected by Defendant, and once again, Defendant failed to articulate coherent grounds for rejecting the invoice, initially requesting additional information during a conversation with PRI and its counsel, after which PRI submitted a third revised invoice for the work performed in October 2024, attempting to

address Defendant's purported concerns and ever escalating requests for additional information not contemplated or required by the Contract.

24.     Defendant once again rejected the second invoice for the third time and, in a communication dated December 10, 2024, outlined additional purported requirements for the invoicing process that they had failed to identify in their prior conversations and communications with PRI.

25.     On December 13, 2024, PRI responded to Defendant's counsel addressing each of Defendant's new requests and noting that the Contract only allows the Defendant to reject an invoice when it is incorrect. PRI also noted, for example, the constantly shifting goalposts with respect to what was required for payment of the invoice including, but not limited to, what constituted sufficient "backup documentation", a term that was left undefined in the Contract and on which Defendant attempts to rely by constantly shifting their definition of what is required as "backup documentation."

26.     Despite alerting Defendant as to its incorrect interpretation of the Contract terms, PRI again produced the documentation requested by the Defendant's December 10, 2024, communication in a last-ditch effort to salvage the relationship with Defendant.

27.     Rather than respond or otherwise engage with the submitted materials, Defendant instead engaged outside counsel to threaten PRI by making the absurd claim that PRI's efforts to receive payment for work it had already done somehow made Defendant unsure about PRI's willingness to fulfill its obligations under the Contract and demand assurances from PRI. In turn, PRI noted that it continues to be ready, willing, and able to perform the work under the Contract but will not do so if they are not compensated as contemplated by the Contract. In their missive, Defendant ordered PRI to stop work, which PRI has done.

28.     Defendant's stated desire to withhold payment on arbitrary grounds despite their contractual obligations and failure to identify any grounds for error in PRI's invoices notwithstanding, PRI has made beyond commercially reasonable efforts to adapt to

1    Defendant's ever moving requests for documentation in an effort to maintain the

2    relationship with Defendant.

3        29.    Unfortunately, at this juncture, it appears that for whatever reason,

4    Defendant, or someone within their organization, is dead set on preventing PRI from

5    fulfilling its obligations under the Contract by withholding payment and relying on

6    increasingly onerous and strained interpretations of the Contract to demand

7    documentation. Defendant has recently withdrawn outstanding RFP's for other portions of

8    the Project. On information and belief, these withdrawals in conjunction with Defendant's

9    behavior and steadfast refusal to pay PRI under the Contract reflects the fact that RTC

10    never had any intention of fulfilling the Project and is seeking to shirk its obligations under

11    the Contract to further these ends.

12        30.    Accordingly, PRI has been forced to bring this action seeking damages for

13    breach of contract and for breach of the implied covenant of good faith and fair dealing.

14    / / /

15    / / /

16    / / /

17    / / /

18    / / /

19    / / /

20    / / /

21    / / /

22    / / /

23    / / /

24    / / /

25    / / /

26    / / /

27    / / /

28    / / /

**FIRST CLAIM FOR RELIEF**

**Breach of Contract**

31.　Paragraphs 1 through 30 of this Complaint are hereby re-alleged and incorporated by reference.

32.　Section B-4(a) of the Contract between PRI and the Defendant requires that "[u]pon reconciliation of all errors, corrections, credits, and disputes, payment to [PRI] will be made in full within 30 calendar days."

33.　PRI submitted an invoice for services performed in October 2024 under the Contract on or about November 6, 2024. Defendant accepted and approved the payment until it was taken to Defendant's Deputy CEO for approval, at which time the payment was withheld without articulating a legitimate reason for doing so.

34.　Defendant subsequently began to demand ever increasing levels of backup documentation, erroneously claiming that these were somehow required under the Contract. At no point has Defendant questioned the work that has been performed, alleged that some of the work was not performed, or otherwise identified any error in the submission.

35.　Accordingly, because Defendant has been unable to identify any errors in the invoice that was submitted or alleged that any of the work was not performed or that the amounts are not due, Defendant had thirty days from receipt of the November 6, 2024 invoice to pay the $147, 600 in full.

36.　To date, Defendant has not paid the November 6, 2024 invoice and thus is in material breach of the contract.

37.　PRI has adhered to its obligations under the Contract and continued work in November 2024 in parallel with attempting to resolve the invoicing issues.

38.　Accordingly, PRI is entitled to payment of the November 6, 2024 invoice as well as the work that was performed in November 2024 that, but for this dispute, would have been invoiced at the beginning of December, 2024.

/ / /

39.     PRI is entitled to damages of two hundred and ninety-five thousand two hundred dollars ($295,200) which reflects the amounts actually invoiced for work performed in October 2024 ($147,600) and the work performed by PRI in November 2024 ($147, 600) that could not be invoiced because of Defendant's intractability with respect to the invoicing and payment process.

**SECOND CLAIM FOR RELIEF**

**<u>Breach of the Implied Covenant of Good Faith and Fair Dealing</u>**

40.     Paragraphs 1 – 39 of this Complaint are realleged and incorporated herein by reference.

41.     The covenant of good faith and fair dealing is inherent in any agreement between two parties. Where "one party to the contract deliberately countervenes [*sic*] the intention and spirit of the contract, that party can incur liability for breach of the implied covenant of good faith and fair dealing." *Hilton Hotels Corp. v. Butch Lewis Prods.*, 107 Nev. 226, 232 (1991).

42.     Here, Defendant has consistently placed ever-moving road blocks to PRI's ability to receive the payment it is due for work it has performed. Even if Defendant's strained interpretation of the Contract's language were correct (which it is not), their constantly shifting demands for backup documentation contravenes the intention and spirit of the contract.

43.     The Contract's intention is to set a fixed price for the Project, and to provide a payment schedule to accompany the work being performed by PRI over the life of the Contract. The payment schedule submitted by PRI to the Defendant placed them on notice of the work and milestones and the documentation supplied by PRI, in an ever-increasing level of detail, supports that the work being invoiced has been performed.

44.     Defendant has contravened the intention and spirit of the Contract by refusing to pay the invoice on arbitrary grounds that PRI had "been paid enough" and compounded their bad faith by forcing PRI to jump through a series of ever-increasing hoops in an attempt to salvage the Project and obtain payment that PRI legitimately earned.



45.     Further, Defendant's behavior since October 2024 both with respect to PRI and in withdrawing other outstanding RFP's related to the project is, on information and belief, indicative that RTC has no intention of completing the Project and conjured the dispute with PRI to avoid its obligations under the Contract and provide an excuse to legitimize its ultimate aim, the cessation of the Project.

46.     PRI justifiably relied on Defendant's representations in the contract that it would make payment for the work invoiced by PRI. By executing the Contract, PRI expected that it would receive payment for the work being done and forewent the pursuit of other Projects in order to comply with its obligations under the Contract.

47.     Defendant's breach of the implied covenant of good faith and fair dealing is material and has damaged PRI.

48.     PRI is entitled to the full agreed-upon price of the Contract that it would have earned but for Defendant's breach and accompanying bad-faith conduct (less the amounts already paid by Defendant), a total sum of two million thirty-three thousand two hundred dollars ($2,033,200).

## CONCLUSION

49.     At every turn in this arduous process, Defendant has constantly shifted its demands for supporting documentation, placing ever higher barriers in a blatant attempt to cover up the fact that from the outset of this dispute, Defendant's management team had no intention of ever paying PRI the amounts owed for the work PRI was completing.

50.     Accordingly, Defendant has breached the Contract as well as the implied covenant of good faith and fair dealing and PRI is entitled to recover the damages it has suffered as a result of Defendant's conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Perrone Robotics, Inc. respectfully moves this Court for judgment in its favor against the Defendant, in the following amounts:

/ / /

/ / /

(1)    Two million thirty-three thousand two hundred dollars ($2,033,200) for breach of contract and for the breach of the implied covenant of good faith and fair dealing, and for all other damages alleged in this Complaint; and

(2)    Prejudgment interest pursuant to NRS 17.130 on all sums awarded to Plaintiff, commencing on November 7, 2024, until paid;

(3)    Attorneys' Fees and Costs as contemplated under Sec. E-1(c) of the Contract and NRS 18.010 and 18.020.

(4)    Such other and further relief as the Court deems just and appropriate.

Dated:  this 5th day of February, 2025.        NEWMEYER & DILLION LLP

By: _____

AARON D. LOVAAS, ESQ. SBN 5701
3800 Howard Hughes Pkwy, Suite 950
Las Vegas, Nevada 89169

EVAN D. MAYO, ESQ. VBN 89383
*(LR IA 11-2 compliance within 14 days)*
MAYO LAW GROUP PLLC
425 Locust Ave., Suite 201
Charlottesville, Virginia 22902

Attorneys for PERRONE ROBOTICS, INC.

**EXHIBIT "1"**

# REGIONAL TRANSPORTATION COMMISSION OF SOUTHERN NEVADA
## Agenda Item

| | |
|---|---|
| **Subject:** | Contract No. 20-014AV, GoMed Autonomous Vehicle Technology |
| **Petitioner:** | David Swallow, Deputy Chief Executive Officer, RTC |
| **Recommendation by Petitioner:** | Approve Contract No. 20-014AV, GoMed Autonomous Vehicle Technology, with Perrone Robotics, Inc. in the amount not-to-exceed $2,392,000.00, from Notice-to-Proceed to June 30, 2026, and authorize the Chair to sign (FOR POSSIBLE ACTION) |
| **Goals:** | Maintain and improve transportation system infrastructure |
| **Meeting:** | RTC Board of Commissioners - Sep 12 2024 |

**FISCAL IMPACT:**

Funds in the amount of $1,000,000.00 are budgeted and available in the Transit Fund in Fiscal Year 2025. Funds will be budgeted from the same fund in future years. Of the total contract amount, up to $1,170,052.00 will be reimbursed by the Federal Transit Administration.

**BACKGROUND INFORMATION:**

On April 16, 2024, the Regional Transportation Commission of Southern Nevada issued Request for Proposals (RFP) No. 20-014AV, GoMed Autonomous Vehicle Technology Project. An evaluation committee comprised of internal and external evaluators completed the review and scoring of all responsive and responsible proposals. Based on the evaluation, the proposal results are as follows:

| Company | Price | Technical Score (60 points total) | Interview (10 points total) | Price (30 points total) | Total Points (100 points total) |
|---|---|---|---|---|---|
| Perrone Robotics, Inc. | $2,392,000.00 | 37.00 | 6.67 | 30.00 | 73.67 |
| ADASTEC Corp | $4,387,250.00 | 40.00 | 0.00* | 16.36 | 56.36 |

*ADASTEC was not invited to interview.

Staff has negotiated a contract with Perrone Robotics, Inc. The GoMed Project is a comprehensive, advanced mobility program that involves deploying emergent technologies to create safer and more efficient ways for people to travel to, from, and within the Las Vegas Medical District (LVMD).

Staff recommends approval.

**ATTACHED:**

RTC_-_GOMED_AV_TECHNOLOGY_PERRONE_Agreement_FINAL_8-29-2024

Case 2:25-cv-00247-CDS-MDC     Document 1     Filed 02/05/25     Page 15 of 66



# CONTRACT NO. 20-014AV
## GOMED AUTONOMOUS VEHICLE TECHNOLOGY

**SERVICE PROVIDER:**    **Perrone Robotics, Inc.**
**Phone: (646) 320-1005**


**John Mottola**
**Chief Operating Officer**
jmottola@perronerobotics.com

**CONTRACT NO. 20-014AV**
**GOMED AUTONOMOUS VEHICLE TECHNOLOGY**

This Contract is made and entered into this **12th** day of **September 2024**, by and between the Regional Transportation Commission of Southern Nevada (hereinafter referred to as "RTC"), having its principal office located at 600 South Grand Central Parkway, Las Vegas, Nevada 89106-4512, and Perrone Robotics, Inc. (hereinafter referred to as "Service Provider"), incorporated in the state of Delaware, having its principal office located at 1000 Research Park Blvd, Suite 106, Charlottesville, VA, 22911 for Autonomous Vehicle (AV) Retrofit Services (hereinafter referred to as "Project").

**RECITALS**

WHEREAS, the RTC conducted a competitive procurement process per Request for Proposal (RFP) No. 20-014AV, GoMed Autonomous Vehicle Technology, to select a Non-exclusive Service Provider;

WHEREAS, pursuant to that process, the RTC selected the Service Provider to provide and retrofit AV technology to existing RTC 'ARBOC - Spirit of Mobility' transit vehicles for the GoMed Project;

WHEREAS, the Service Provider is competent to perform the Services described herein and desires to enter into this Contract with the RTC for the provision of such Services;

WHEREAS, the Service Provider has the required licenses and/or authorizations pursuant to all federal, State of Nevada and local laws in order to conduct business relative to this Contract; and

WHEREAS, the Service Provider has the personnel and resources necessary to accomplish the Project within the required schedule and for the base period price of the contract, including all fees for time and labor for salaries, overhead, materials, equipment, licenses, direct non-salary expenses incurred by the Service Provider.

NOW THEREFORE, in consideration of the mutual promises hereinafter given, it is mutually agreed by and between the Service Provider and the RTC as follows:

**SECTION A – CONTRACT FORM**

The subject matter of this Contract is to for the Service Provider to provide and retrofit AV technology to existing RTC 'ARBOC - Spirit of Mobility' transit vehicles for the GoMed Project.

**SECTION B – BASIC TERMS**

**B-1  DEFINITIONS**

The following definitions apply to this Contract:

(a)  *"Contract"* means this document, consisting of Sections A through F and all Exhibits, which is binding and effective only upon execution by the RTC.

(b)  *"Contract Documents"* means this Contract and the attachments hereto.

(c)  *"Contract Technical Representative"* means the RTC representative who is responsible for the coordination of Contract performance between the RTC and the Service Provider.

(d)  *"Deliverable"* means any report, software, hardware, data, documentation, or other tangible item or event that the Service Provider is required to provide or perform to the RTC under the terms of the Contract.

(e)  *"Non-exclusive Contract"* means a Contract under which the RTC agrees to obtain some, but not necessarily all, of the RTC's requirements for a particular service.

(f)  *"RTC"* means the Regional Transportation Commission of Southern Nevada.

(g) *"RTC Commission" or "Governing Body of the Regional Transportation Commission of Southern Nevada" or "Governing Body"* means the governing body of the Regional Transportation Commission of Southern Nevada and refers to the elected representatives of the entities of Clark County, Nevada, including the county of Clark and the cities of Las Vegas, North Las Vegas, Henderson, Boulder City, and Mesquite, which make up the voting membership of the Regional Transportation Commission of Southern Nevada.

(h) *"Services"* means the services defined in Section C-1 below.

(i) *"Service Provider"* means the individual, partnership, or corporation responsible for the performance of Services under this Contract.

(j) *"Service Provider Representative"* means the individual authorized to act on behalf of the Service Provider regarding routine matters arising under or relating to this Contract.

## B-2   CONTRACT TYPE

The Contract type is not-to-exceed contract. This is a Non-exclusive Contract.

## B-3   PRICES/COSTS/DELIVERABLES

(a) Prices/Costs/Deliverables Schedule
The Service Provider will invoice the RTC in accordance with the payment and deliverables schedule specified in attached **Exhibit B, Fee and Delivery Schedule**. The RTC's obligation to pay the Service Provider cannot exceed the specified amount(s).  It is expressly understood that the Services included in **Exhibit A** must be completed by the Service Provider and it shall be the Service Provider's responsibility to ensure that hours and tasks are properly budgeted so the entire project is completed for the specified amount(s).

(b) The Contract price for the base period of this contract is **$2,392,000.00 (TWO MILLION THREE HUNDRED NINETY-TWO THOUSAND DOLLARS AND ZERO CENTS).**

## B-4   INVOICES

(a) The Service Provider shall submit an invoice to the RTC in accordance with the payment schedule set forth in Paragraph B-3 (Prices/Costs/Deliverables) above and must be accompanied by backup material. The Service Provider shall furnish monthly invoices on or about the first day of each month. The RTC shall pay the invoiced amount within 30 calendar days after the date of receipt of a correct invoice.  All invoices should identify the following items:

1. The date of the invoice;
2. Service Provider name;
3. Complete address (including street, city, state, and zip code);
4. Telephone number;
5. Contact person;
6. Itemized description of Services performed and/or products delivered (including quantities) or Services rendered (including performance dates covered), referencing the contract item;
7. Copies of subcontractor invoices;
8. Itemized pricing and total amount due (excluding Sales and Use Tax);
9. The associated RTC purchase order number;
10. Service Provider's Tax Identification Number;
11. RTC Contract Number;

12.  Percentage Discount/Payment Terms (if offered);

13.  Lien releases, if applicable;

14.  Copy of the progress report, signed/approved by RTC's Contract Technical Representative, if applicable; and

15.  Service Provider's invoice number.

The RTC shall pay claims for supplies, materials, equipment, and Services purchased under the provisions of this contract electronically, unless determined that the electronic payment would cause the payee to suffer undue hardship or extreme inconvenience. The RTC reserves the right to make a payment by check, with five (5) business days' notice. The RTC will provide notice via email or fax to the Service Provider.  All payments under this Contract shall be paid in United States dollars.

RTC shall subtract from any payment made to Service Provider all damages, costs, and expenses caused by Service Provider's negligence, resulting from or arising out of errors or omissions in Service Provider's work products, or services which have not been previously paid to Service Provider.

Upon reconciliation of all errors, corrections, credits, and disputes, payment to the Service Provider will be made in full within 30 calendar days. Invoices received without a valid purchase order number will be returned unpaid.  The Service Provider shall submit an original invoice to:

Regional Transportation Commission
ATTN:  Accounts Payable
600 Grand Central Parkway
Las Vegas, NV  89106 – 4512

(b)  A representative of the Service Provider shall sign and certify the invoice in the following manner:  "I hereby certify, under penalty of perjury, that the above invoice is just and correct and that reimbursement for such expenses listed on this invoice has not been previously received from the RTC nor any other source."

(c)  The Service Provider shall forward a copy of the original invoice to the RTC's Contract Technical Representative identified in Paragraph D-2 (the "Contract Technical Representative/Service Provider Representative").

(d)  Upon termination of this Contract, the Service Provider shall submit a statement summarizing previous billings rendered and payments received and providing any other information necessary for contract close out.  Within 30 calendar days after receipt thereof, the RTC shall pay the Service Provider all amounts due.

(e)  The RTC may withhold or, on account of subsequently discovered evidence, nullify the whole or part of any payment made by the RTC to the Service Provider to such extent as may be necessary to protect the RTC from loss or damage, or to compensate the RTC, caused by, resulting from or arising out of, including but not limited to, any failure to perform Services in accordance with this Contract.

(f)  Service Provider's acceptance of any payment made under this Contract shall constitute a full and complete release by Service Provider of any and all claims, demands, and causes of action against RTC and its parent companies, subsidiaries, and affiliates, for payment for services rendered which Service Provider, its successors or assigns, or anyone claiming under Service Provider, has or may have against RTC and its parent companies, subsidiaries, and affiliates, under this Contract as to that portion or phase of the Services to which such payment relates.

## B-5   CONTRACT TERM

(a)  Notice to Proceed The parties to this Contract understand and agree that execution of this Contract by the RTC is not a notice-to-proceed with the Services of this Contract.  A notice-to-proceed will be given by the RTC to the Service Provider after receipt and approval of all insurance requirements specified in this Contract or equivalent protection.

(b)  <u>Performance Period</u>  The base contract term commences at Notice to Proceed and ends June 30, 2026.

(c)  <u>Contract Renewals</u> – NONE

(d)  <u>Delivery Schedule</u>  The Service Provider shall provide Services in accordance with the deliverables schedule specified in attached Exhibit B.

(e)  <u>Cooperation</u>  At the completion of the term of this Contract or in the event of a termination of this Contract prior to the completion of its term, the Service Provider shall fully cooperate in any procurement process conducted by the RTC and in any transition to a new service provider.

## SECTION C – SCOPE OF SERVICES

**C-1  SCOPE OF SERVICES**

The Service Provider shall provide the materials, equipment, products, and labor to accomplish, produce, and deliver the products and services specified in **Exhibit A,** (the "Services").  The Service Provider shall not provide Services beyond the scope of this Contract unless those services and compensation for those services have been defined in an approved amendment to this Contract.

**C-2  DUTY TO CORRECT ERRORS/OMISSIONS**

If, at any time during the performance of its Services or during the maximum period permitted by law after completion of the same, it is discovered that Service Provider or any of its respective officers, directors, agents, employees, have committed any negligent act, error or omission, or has failed to meet the warranties and representations contained herein, which has caused or will cause otherwise unnecessary additional expense to RTC, then Service Provider shall, at RTC's request, promptly make all necessary corrections and/or bear any and all such additional expenses associated with the correction of the same.

## SECTION D – SPECIAL CONDITIONS

**D-1  LEGAL NOTICE**

(a)  All legal notices required pursuant to the terms and conditions of this Contract shall be in writing, unless an emergency situation dictates otherwise.  Any notice required to be given under the terms of this Contract shall be deemed to have been given when:

1. Received by the party to whom it is directed by hand delivery or personal service, or
2. Transmitted by facsimile with confirmation of transmission, or
3. Sent by U.S. mail via certified mail-return receipt requested at the following addresses:

FOR THE RTC:
Regional Transportation Commission of Southern Nevada
Purchasing and Contracts
600 Grand Central Parkway
Las Vegas, Nevada 89106-4512
Fax: (702) 676-1588

with electronic copy to CyrM@rtcsnv.com which shall not constitute legal notice.

FOR THE SERVICE PROVIDER:
Perrone Robotics, Inc.

1000 Research Park Blvd, Suite 106
Charlottesville, VA 22911
(434) 260-8550

with electronic copy to evan@mayolawgroup.com which shall not constitute legal notice.

(b)  The parties shall provide written notification of any change in the information stated above.

(c)  An original signed copy, via U. S. Mail, shall follow email transmissions.

(d)  For purposes of this Contract, legal notice shall be required for all matters involving potential termination actions, litigation, indemnification, and unresolved disputes.  This does not preclude legal notice for any other actions having a material impact on the Contract.

(e)  Routine correspondence should be directed to the Contract Technical Representative or the Service Provider Representative, as appropriate.

## D-2  RTC TECHNICAL CONTRACT REPRESENTATIVE / SERVICE PROVIDER REPRESENTATIVE

(a)  The RTC designates the following as the Contract Technical Representative for this Contract:

**Irene Lam**
**Principal Project Engineer**
**LamI@rtcsnv.com**

The RTC will provide written notice to the Service Provider, should there be a subsequent Contract Technical Representative change. The Contract Technical Representative will be the Service Provider's principal point of contact at the RTC regarding any matters relating to this Contract, will provide all general direction to the Service Provider regarding Contract performance, and will provide guidance regarding the RTC's goals and policies.  The Contract Technical Representative is not authorized to waive or modify any material scope of Services changes or terms of the Contract. The RTC agrees that its officers and employees and consultants will cooperate with Service Provider in the performance of Services under this Contract and will be available for consultation with Service Provider at reasonable times with advance notice as to not conflict with other responsibilities.

(b)  The Service Provider designates the following as the Service Provider Representative for this Contract:

**John Mottola**
**Chief Operating Officer**
**jmottola@perronerobotics.com**

The Service Provider will provide written notice to the RTC, should there be a subsequent Service Provider Representative change.  The RTC has the right to assume that the Service Provider Representative has full authority to act for the Service Provider on all matters arising under or relating to this Contract. Should the Service Provider Representative of the Service Provider be unable to complete their responsibility for any reason, the Service Provider shall replace him or her or them with a competent person, or subconsultant/subcontractor with the RTC's approval.

## D-3  SERVICE PROVIDER BACKGROUND CHECKS

(a)  It is the policy of the RTC for successful bidders to conduct background checks on all contract employees that require unescorted access onto any RTC properties. The Service Provider shall make all reasonable efforts to ensure that employees having contact with the public in the course of their assigned duties are of good moral character. The Service Provider prior to hiring shall conduct employee candidate background check screenings of all positions, to include those considered safety-sensitive as defined by Federal Transit Administration (FTA) guidelines. This may include, but is not limited to work history, criminal background history and credit review as

required for the position.

(b) Results of a background check must comply with the RTC background check standards as outlined below:

    1. Must utilize a licensed background check; Service Provider to run criminal background checks and personal credit history reviews (as applicable). Criminal background checks must include arrest and conviction reports (county, state, and nationwide) for all jurisdictions that the proponent has resided in the previous seven (7) years.

    2. Unless otherwise required by applicable law, in accordance with Title VII of the Civil Rights Act of 1964 and corresponding guidance from the U.S. Equal Employment Opportunity Commission, information obtained during the criminal record check will not be used as a basis for denying or terminating employment, unless the criminal offense resulted in a conviction that is recent (or sufficiently serious to be of issue regardless of how recently it occurred) and relevant to the job in question.

    3. When assessing criminal conviction records, service providers are required to consider the following factors:

        a. Nature and gravity of the offense(s)
        b. The time that has passed since the offense and/or completion of the sentence; and
        c. The nature of the job sought/held

No one factor should necessarily govern the analysis; all three factors should be weighed together when determining persons to work or services at RTC properties.

(c) The Service Provider is required to collect background information on "Individuals" consistent with the Federal Fair Credit Reporting Act (FCRA) and any applicable state laws.

(d) Once background check clearance has been determined, the successful bidder will notify the Technical Contract Representative via email that the employee has been approved to work on RTC premises.

(e) The Service Provider will be required to maintain all records related to background check screenings conducted for all employees working at RTC properties. For the purposes of audit and oversight by RTC, the Service Provider will make all background check records available to RTC representatives in an effort to ensure established RTC standards/guidelines are followed. All Background check records must be maintained on all employees working on RTC property for the term of the Contract.

**D-4    RTC SERVICE PROVIDER IDENTIFICATION BADGES NOT USED**

**D-5    SERVICE PROVIDER KEYS TO FACILITY NOT USED**

**D-6    WARRANTY**

(a) Services: The Service Provider warrants that the Services shall be performed in full conformity with this Contract, with the professional skill and care that would be exercised by those who perform similar Services in the commercial marketplace, and in accordance with accepted industry practice. In the event of a breach of this warranty and/or in the event of non-performance and/or failure of the Service Provider to perform the services in accordance with this Contract, the Service Provider shall, at no cost to the RTC, re-perform or perform the Services so that the Services conform to the warranty.

(b) Products: If applicable, the Service Provider shall guarantee all workmanship, materials, and equipment it has furnished for a period of one year after final acceptance of the equipment and/or materials; and, if during the guarantee period, any defect or faulty materials are found, it shall immediately, upon notification by the RTC, proceed at its own expense to replace and repair same, together with any damage to all finishes, fixtures,

equipment, and furnishings that may be damaged as a result of this defective equipment or workmanship. In addition to the one-year warranty, the service provider will continue to provide a warranty, including services and products, for an additional three years. Providing a total of four years after final acceptance of the equipment and/or materials.

(c)

(d)  Warranty Administration:  In the event of any action by the RTC to recover damages for breach of all warranties, the Service Provider agrees to pay the RTC for such damages and the costs associated with such action, including reasonable attorneys' fees.

In the event any materials or equipment supplied hereunder are covered by warranties of the manufacturer or Service Provider other than the Service Provider, then copies of such warranties must be furnished to the RTC at the time of delivery and, if required by the RTC, Service Provider will assign such warranties to the RTC. Delivery or assignment of such manufacturer's or Service Providers' warranties shall in no event relieve Service Provider of any of its obligations.

No disclaimer of liability, limitations on time of warranty, limitations on scope of warranty, or limitations on damages inconsistent with the warranties contained herein shall be effective for any purpose. No warranty contained herein nor otherwise given shall be construed to limit any other remedy available to the RTC by law nor to limit the time in which such other remedy may be sought.

**D-7   INTELLECTUAL PROPERTY RIGHTS; OWNERSHIP AND USE OF MATERIALS**

(a)  As between RTC and Service Provider, and further defined in Exhibit A, Service Provider is and will remain the sole and exclusive owner of all right, title, and interest in and to the Services and Documentation, including all Intellectual Property Rights relating thereto. Except for the rights and licenses expressly set forth in this Contract, nothing herein shall be construed as granting RTC or any third party any right, title, or interest in or to the Services and Documentation, whether by implication, estoppel, or otherwise.

(b)  Upon Service Provider's acceptance of the fees under the applicable service order and for the duration of the Term, Service Provider grants RTC subject to the terms herein, the nonexclusive, non-assignable (subject to Section E-10 below), non-transferable (subject to Section E-10 below), royalty-free and limited right to use the Service Provider's Platform and Documentation, to receive the Services solely for RTC's business operations. RTC may access the Service Provider's Platform via individuals who are authorized by RTC, in accordance with this Contract, to access and use the Service Provider's Platform on its behalf ("Authorized Users"). RTC is solely responsible for maintaining the confidentiality of its account information and for anything that happens through the use of RTC's account information, including via its Authorized Users.   Unless prior written authorization is obtained from the Service Provider and/or otherwise specified in the applicable service order, RTC shall not, and shall not authorize others, to: (a) modify, alter, create derivative works from, reverse engineer, decompile, or disassemble any part of the Service Provider's Platform or Services, nor attempt in any other manner to obtain the source code or otherwise reduce to human-perceivable form any part of the Service Provider's Platform or Services; (b) frame, mirror, republish, download, display, transmit, or distribute all or any portion of the Service Provider's Platform or Services (including any Documentation which accompanies the Services) in any form or media or by any means; (c) create a database by systematically downloading and storing all or any of the content made available through the Services; (d) remove or obscure any proprietary notices, labels, or marks on or in any part of the Platform or Services, including without limitation any trademark or copyright notices; (e) disclose the results of testing or benchmarking of the Services to any third party, or access or use the Services or any part thereof in order to build or support, or assist a third party in building or supporting, products or services which are competitive to Service Provider's Platform or Services; (f) sublicense, rent, lease, host, outsource, display, or commercially exploit any part of the Services, or use the Services to provide services to third parties; (g) attempt to obtain, or assist third parties in obtaining, unauthorized access to the Service Provider's Platform or Services, and/or associated Documentation; (h) use the Service

Docusign Envelope ID: E9249547-8E47-4503-9CB6-955212072368

Provider's Platform or Services in any manner not expressly authorized under this Contract; or (i) take any actions which would disable the Platform or Services or impair in any way their operation based on the elapsing of a period of time, the exceeding of an authorized number of copies, or the advancement to a particular date or other numeral (referred to as "time bombs", "time locks", or "drop dead" devices); (ii) would prevent Service Provider from accessing the Platform or Services for the purposes of their operations; or (iii) infringe or violate any of this Contract or allow and/or enable a third party to do any of the aforementioned.

(c)   RTC may use agents, independent contractors, consultants, outsourcers and other third party vendors of RTC, acting in furtherance of the business purposes of RTC and in connection with the agreement in effect with RTC (the "Permitted End Users"). RTC shall remain responsible for its obligations under this Contract and for the actions of its Permitted End User in connection therewith except for Permitted End Users that have entered into a written agreement with Service Provider (or to which Service Provider is a third-party beneficiary) agreeing to be bound by the terms of this Contract, in which case such Permitted End Users will be independently responsible for their acts and omissions in connection with this Contract.

(d)   The Service Provider represents and warrants to the RTC that the Service Provider is either the owner of or has obtained all necessary permissions, consents, copyrights or licenses to any materials to be utilized in connection with the performance under this Contract arising out of or relating to the Service Provider's execution of this Contract. Further, the Service Provider agrees to hold harmless, defend, and indemnify the RTC against any damages, suits, claims, or demands that may be incurred by or asserted against the RTC, or any officer, director, employee, contractor, or subcontractor, relating to the Service Provider's performance of the Services. The RTC will provide the Service Provider a reasonable opportunity to resolve any dispute concerning ownership or use of the materials prior to any settlement by RTC of such dispute. The Service Provider consents and agrees to the RTC's use of any such materials for the RTC's promotional purposes to the extent that Service Provider is permitted to do so as part of the normal course of business without any obligations or liability on the part of the RTC for any charges or royalties.

## D-8   LICENSES/REGISTRATIONS

During the entire performance period of this Contract, the Service Provider shall maintain all federal, state, and local licenses, certifications, and registrations applicable to the Services performed under this Contract, including maintaining an active applicable business license. The cost of any required licenses or permits shall be the responsibility of the Service Provider. The Service Provider is liable for any and all taxes due as a result of the performance of this Contract.

## D-9   REVIEW COMMENTS

The Services performed by Service Provider under this Contract shall be subject to periodic review by the RTC and/or its Chief Executive Officer ("CEO"). The review comments of RTC's representative may be reported in writing as needed to Service Provider. It is understood that RTC's representative(s) review comments do not relieve Service Provider from the responsibility for the professional and technical accuracy of all Services provided under this Contract. The RTC's CEO may delegate any or all of the CEO's responsibilities under this Contract to appropriate staff members, and shall so inform Service Provider by written notice before the effective date of each delegation. The comments of the RTC's CEO or the CEO's designated staff may be reported to Service Provider by the RTC's CEO. It is understood that the RTC CEO's comments do not relieve Service Provider from the responsibility for the professional quality of all Services provided under this Contract. To prevent an unreasonable delay in the Service Provider's Services, the CEO will endeavor to examine all reports and other documents and will render decisions and advise the Service Provider in a timely manner to avoid unreasonable delay.

## D-10   DATA AVAILABLE

(a)   RTC shall, without charge, furnish to or make available for examination or use by Service Provider as it may request, any data which RTC has available, including as examples only and not as a limitation:

     1.   Copies of reports, surveys, records, and other pertinent documents.

     2.   Copies of previously prepared reports, job specifications, surveys, records, ordinances, codes, regulations, other documents, and information related to the Services specified by this Contract.

(b)  RTC shall assist Service Provider in obtaining data on documents from public officers or agencies, and from private citizens and business companies, whenever such material is necessary for the completion of the Services specified by this Contract.

(c)  The Service Provider shall return any original data provided by the RTC.

## D-11  LIQUIDATED DAMAGES

Service Provider acknowledges that the RTC is damaged when Service Provider fails to perform Services or supply proof of insurance or performance bond, if applicable, according to the requirements detailed in Exhibit A, Scope of Services and if applicable, Exhibit D, List of Additional Proposal Services and Obligations. Damages include but are not limited to damage to the RTC reputation and perception in the community and RTC costs to provide replacement maintenance services.

(a)  For non-performance or non-timely performance of completed retrofitted AV equipment and delivered to RTC, by April 2025, Service Provider shall pay to the RTC $500 in liquidated damages per day, per documented incident.

(b)  For non-performance or non-timely performance of completion of the testing and final acceptance of the AV vehicle requirements, as detailed in Exhibit A, Scope of Work, by April 2026, Service Provider shall pay to the RTC $1000 in liquidated damages per day, per documented incident.

The RTC shall notify Service Provider in writing of non-performance or non-timely performances and shall reasonably document all claims for liquidated damages.

*(Federal Funds)* Any federally funded contract is required to contain either:
(a)  Liquidated damages provisions based on anticipated damages to be suffered by the RTC which are impossible to determine due to late delivery performance  and are to be shown in the contract a specified rate per day, or
(b)  Actual damages to RTC and the method of calculation documented in the procurement file.
The above-referenced Liquidated Damages amount(s) is/are reflective of this requirement.

## D-12  LETTER OF CREDIT NOT USED

## D-13  FEDERAL CONDITIONS

This project may be funded in part by federal funds.  If applicable, the Federal Conditions are attached **Exhibit E** to the Contract.

## D-14  PRICE ADJUSTMENT REQUESTS

## D-15  SURVIVAL

The terms and conditions of this Contract regarding confidentiality, payment, warranties, indemnification, liability, and all others that by their sense and context are intended to survive the execution, delivery, performance, termination, or expiration of this Contract survive and continue in effect.

## D-16  ORDER OF PRECEDENCE

In the event of a conflict between the specific language set forth in Sections B through E of this Contract and any Attachment or Exhibit set forth in Section F, the specific language in Sections B through E shall prevail.  Any exception to this order of precedence will be addressed through specific language elsewhere in Sections B through E.

## D-17  SERVICE PROVIDER'S REQUIREMENTS:  PERSONNEL

The Service Provider shall maintain a local office staffed with a local manager, sales personnel, and operations staff to service this Contract. The Service Provider shall assign a project manager to this project. The Service Provider's project manager shall be available to the RTC's project manager to provide any information pertaining to the Service Provider's performance on this Project. Should the Service Provider's project manager be unable to complete their responsibility for any reason, the Service Provider shall replace the project manager with a competent person.

## D-18  RISK OF LOSS OR DAMAGE

If applicable to the Services, the Service Provider shall be responsible for any losses or damages to:

    (a)  Goods or materials provided by Service Provider to the RTC until RTC accepts the goods or materials in writing; and

    (b)  RTC property during the performance of the Services.

## SECTION E – GENERAL PROVISIONS

## E-1  DISPUTES

    (a)  For each claim or dispute arising between the parties under this Contract, the parties shall attempt to resolve the matter through escalating levels of management.  In the event the matter cannot be successfully resolved in this manner, the RTC is granted the right, regardless of which party is asserting the claim or dispute, to determine between arbitration or litigation as the forum in which the party desiring to proceed further shall file to resolve the claim or dispute.  For any and all claims or disputes asserted by the Service Provider, the Service Provider shall notify the RTC of its intent to proceed further with the claim or dispute, and in response thereto, the RTC shall notify the Service Provider as to its selected forum for resolution.  For any and all claims or disputes asserted by the RTC, the RTC shall notify the Service Provider in the notice of its intent to proceed with further resolution and in the same notice as to whether it has selected arbitration or litigation as the forum to resolve the claim or dispute.  In the event arbitration is the designated forum, such arbitration shall be binding on the parties.

    (b)  If arbitration is selected by the RTC as the forum for further resolution, the claim or dispute shall be filed with the Nevada Arbitration Association or the American Arbitration Association under its then current Commercial Arbitration Rules, Expedited Procedures, regardless of the amount of the claim or dispute.

    (c)  The laws of the State of Nevada shall govern this Contract and the venue for purposes of such litigation or arbitration and the venue for purposes of any litigation or arbitration shall be in a competent jurisdiction in Clark County, Nevada. If litigation is required as a result of this Contract, the prevailing party will be entitled to its reasonable costs and attorney fees.

## E-2  NOTICE OF DELAY

Should the timely performance of this Contract be jeopardized by the non-availability of RTC provided personnel, data, or equipment, the Service Provider immediately shall notify the RTC in writing of the facts and circumstances that are contributing to such delay however, such notice shall not relieve the Service Provider from any existing obligations regarding performance or delivery.

Upon receipt of this notification, the RTC will advise the Service Provider in writing of the action which will be taken to remedy the situation.

## E-3  SUSPENSION

RTC may suspend performance by Service Provider under this Contract for such period of time as RTC, at its sole discretion, may prescribe by providing written notice to Service Provider at least 10 working days prior to the date on

which RTC wishes to suspend. Upon such suspension, RTC shall pay Service Provider its compensation, based on the percentage of the Project completed and earned until the effective date of suspension, less all previous payments. Service Provider shall not perform further Services under this Contract after the effective date of suspension until receipt of written notice from RTC to resume performance. In the event RTC suspends performance by Service Provider for any cause other than the error or omission of the Service Provider, for an aggregate period in excess of 30 days, Service Provider may be entitled to an equitable adjustment of the compensation payable to Service Provider under this Contract to reimburse Service Provider for additional costs occasioned as a direct result of such suspension of performance by RTC based on appropriated funds and approval by the RTC.

## E-4  TERMINATION FOR CONVENIENCE

The RTC shall have the right at any time to terminate further performance of this Contract, in whole or in part, for any reason whatsoever (including no reason). After receipt of a written notice of termination, and except as otherwise directed by the RTC, the Service Provider shall:

(a)  Stop work or services under said contract on the date and to the extent specified in the notice of termination;

(b)  Place no further orders or subcontracts for materials, services, or facilities, except as may be necessary for completion of such portion of the work or services under said contract as is not terminated;

(c)  Terminate all orders and subcontracts to the extent that they relate to the performance of work or services terminated by the notice of termination;

(d)  Assign to the RTC in the manner, at the times, and to the extent directed by the RTC, all of the right, title, and interest of the Service Provider under the orders and subcontracts so terminated, in which case the RTC shall have the right, in its discretion, to settle or pay any or all claims arising out of the termination of such orders and subcontracts;

(e)  Settle all outstanding liabilities and all claims arising out of such termination of orders and subcontracts to the extent the RTC may require;

(f)  Transfer title to the RTC and deliver in the manner, at the times, and to the extent, if any, directed by the RTC the fabricated or unfabricated parts, work or services in process, or completed Services, supplies, and other materials produced as a part of, or acquired in connection with their performance of, the Services terminated, and the completed or partially completed plans, drawings, information, and other property which, if said contract had been completed, would have been required to be furnished to the RTC;

(g)  Use its best efforts to sell, in the manner, at the times, to the extent, and at the price(s) directed or authorized by the RTC, any property of the types referred to above; provided, however, that the Service Provider shall not be required to extend credit to any purchaser, and may acquire any such property under the conditions prescribed by and at a price(s) approved by the RTC, and provided further that the proceeds of any such transfer or disposition shall be applied in the reduction of any payments to be made by the RTC to the Service Provider under said contract or shall otherwise be credited to the price or cost of the services covered by said contract or paid in such other manner as the RTC may direct;

(h)  Complete performance of such part of the work or services as shall not have been terminated by the notice of termination;

(i)  Take such action as may be necessary, or as the RTC may direct, for the protection or preservation of the property related to said contract which is in the possession of the Service Provider and in which the RTC has or may acquire an interest; and

(j)  Shall submit a written request for incurred costs for Services performed through the date of termination, and shall provide any substantiating documentation requested by the RTC. In the event of such termination, the

RTC agrees to pay the Service Provider within 30 days after receipt of a correct, adequately documented written request approved by the RTC. The RTC's sole liability under this paragraph is for payment of the costs for the services requested by the RTC and actually performed by the Service Provider.

Settlement of claims by the Service Provider or recoveries by the RTC under this termination for convenience clause shall be in accordance with the legal rights and liabilities of the parties to said contract.

## E-5   TERMINATION FOR DEFAULT

(a)   The RTC may, by written notice of default to the Service Provider, terminate this Contract in whole or in part if the Service Provider fails to:

1.   Perform the Services under Section C (Scope of Services), including, if applicable, delivering any required software, goods, or documentation within the time specified in this Contract or any extension;

2.   Make progress, so as to endanger performance of this Contract; or

3.   Perform any of the other provisions of this Contract.

(b)   The RTC's right to terminate this Contract under (a)(1), (a)(2), and (a)(3) above, may be exercised if the Service Provider does not cure such failure within ten (10) calendar days (or more if authorized by the RTC) after notice, specifying the failure, is provided pursuant to the Paragraph D-1 (Legal Notice) of this Contract.

(c)   If said contract is terminated in whole or in part for default, the RTC may procure, upon such terms and in such manner as the RTC may deem appropriate, similar services to that so terminated.  The Service Provider shall be liable to the RTC for costs associated with the termination of this Contract, the procurement of replacement services by the RTC, any excess costs of such similar supplies or services, and any increase in the total agreement costs or the hourly rate as a result of the re-procurement of services from the date of termination to the expiration date of the original Contract, and shall continue the performance of said contract to the extent not terminated under the provisions of this clause.

(d)   Except as otherwise provided, settlement of claims by the Service Provider under this termination Section shall be in accordance with the provisions set forth in 48 C.F.R. Part 49, as amended from time to time.

(e)   Either party may terminate this Contract, in whole or in part, if the other party becomes insolvent or bankrupt or makes an assignment for the benefit or creditors, or if a receiver or trustee in bankruptcy is appointed for the other party, or if any proceeding in bankruptcy, receivership, or liquidation is instituted against the other party and is not dismissed within 30 calendar days following commencement thereof.

(f)   The RTC retains the right to terminate for default immediately should the Service Provider fail to maintain the required levels of insurance, fail to comply with applicable local, state, and Federal statutes governing performance of these Services, or fail to comply with statutes involving health or safety.

(g)   RTC reserves the right to cancel the Contract upon 30 calendar days' written notice with good cause.

## E-6   CANCELLATION OF CONTRACT

In any of the following cases, the RTC shall have the right to cancel this Contract without expense to the RTC:

(a)   The Service Provider is guilty of misrepresentation;

(b)   This Contract is obtained by fraud, collusion, conspiracy, or other unlawful means; or

(c)   This Contract conflicts with any statutory or constitutional provision of the State of Nevada or the United

States.  This Section shall not be construed to limit the RTC's right to terminate this Contract for convenience or default.

## E-7   INSURANCE

The Service Provider shall procure and maintain, at its own expense, during the entire term of the Contract, the coverage(s) specified in **Exhibit C.**

## E-8   INDEMNITY

1. INDEMNITY.  SERVICE PROVIDER SHALL INDEMNIFY, HOLD HARMLESS AND, AT REGIONAL TRANSPORTATION COMMISSION'S OPTION, DEFEND (WITH COUNSEL REASONABLY ACCEPTABLE TO RTC) RTC, RTC COMMISSION, AND THEIR RESPECTIVE SUBSIDIARIES, AFFILIATES, PARENT COMPANIES AND THEIR RESPECTIVE MEMBERS, OFFICERS, DIRECTORS, MANAGERS, EMPLOYEES, AGENTS, SHAREHOLDERS, SUCCESSORS AND ASSIGNS, HEIRS, ADMINISTRATORS, AND PERSONAL REPRESENTATIVES (COLLECTIVELY, "RTC INDEMNITEES") FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, DAMAGES, LOSSES (INCLUDING, WITHOUT LIMITATION, LOSS OF REVENUES), LAWSUITS, OTHER PROCEEDINGS, CAUSES OF ACTION, LIABILITIES, CLAIMS OF LIEN, LIENS, CIVIL OR CRIMINAL PENALTIES AND CHARGES, OTHER COSTS AND EXPENSES (INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEY'S AND EXPERTS' FEES AND COSTS, WHETHER OR NOT SUIT IS FILED) (COLLECTIVELY, "**ACTIONS**"), CAUSED IN WHOLE OR IN PART BY, RELATES TO OR ARISES OUT OF OR IS INCIDENT TO: PROPERTY DAMAGE; PERSONAL INJURIES; EMOTIONAL OR BODILY INJURY OR DEATH; CLAIMS RESULTING DIRECTLY OR INDIRECTLY FROM ANY BREACH OF THIS CONTRACT; OR ANY INTENTIONAL TORTIOUS MISCONDUCT OR NEGLIGENT ACT, OMISSION OR ERROR OF THE SERVICE PROVIDER OR ANY OF THE SUB-CONSULTANTS/SUBCONTRACTORS RETAINED BY SERVICE PROVIDER OR THEIR RESPECTIVE AGENTS, DIRECTORS, OFFICERS AND EMPLOYEES IN CONNECTION WITH THE PERFORMANCE OR CONDUCT OF ANY SERVICE PROVIDED UNDER THIS CONTRACT, PROVIDED THAT THE INDEMNITY AND DEFENSE OBLIGATION OF SERVICE PROVIDER SET FORTH IN THIS SECTION 1 SHALL NOT APPLY TO CLAIMS FOR PROFESSIONAL NEGLIGENCE ACTIONS ARISING OUT OF THE SERVICE PROVIDER'S PERFORMANCE OF PROFESSIONAL SERVICES UNDER THIS CONTRACT, WHICH ACTIONS ARE COVERED BY SECTION 3 BELOW, AND PROVIDED FURTHER, THAT SERVICE PROVIDER SHALL NOT BE LIABLE HEREUNDER TO THE EXTENT THAT THE ACTION IS CAUSED BY THE SOLE NEGLIGENCE OF THE RTC AND OR THE RTC  INDEMNITEES IN ACCORDANCE WITH APPLICABLE LAW REGARDING COMPARATIVE NEGLIGENCE. SERVICE PROVIDER SHALL BE REQUIRED TO NOTIFY RTC WITHIN 48 HOURS OF BECOMING AWARE OF ANY ACTIONS THAT RESULTS FROM THE PERFORMANCE OF ITS OBLIGATIONS UNDER THIS CONTRACT.

2. MECHANIC LIEN INDEMNIFICATION.  IF APPLICABLE TO THE SERVICES, SERVICE PROVIDER SHALL INDEMNIFY, HOLD HARMLESS AND, AT RTC'S OPTION, DEFEND (WITH COUNSEL REASONABLY ACCEPTABLE TO RTC) THE RTC INDEMNITEES FROM ANY CLAIMS OR MECHANIC'S LIENS BY ANY OF SERVICE PROVIDER'S SUB-CONSULTANTS/SUBCONTRACTORS AS A RESULT OF THE FAILURE OF SERVICE PROVIDER, OR THOSE FOR WHOSE ACTS IT IS RESPONSIBLE, TO PAY FOR ANY SERVICES, MATERIALS, LABOR, EQUIPMENT, TAXES OR OTHER ITEMS OR OBLIGATIONS FURNISHED OR INCURRED FOR OR IN CONNECTION WITH THE SERVICES OR THE PROJECT FOR WHICH SERVICE PROVIDER IS ACTUALLY PAID BY RTC.  WITHIN THREE (3) DAYS OF RECEIVING WRITTEN NOTICE FROM RTC THAT SUCH A CLAIM OR MECHANIC'S LIEN HAS BEEN FILED, SERVICE PROVIDER SHALL COMMENCE TO TAKE THE STEPS NECESSARY TO DISCHARGE SAID CLAIM OR LIEN, INCLUDING, IF NECESSARY, THE FURNISHING OF A MECHANIC'S LIEN BOND.  IF SERVICE PROVIDER FAILS TO DO SO, RTC WILL HAVE THE RIGHT TO DISCHARGE THE CLAIM OR LIEN AND HOLD SERVICE PROVIDER LIABLE FOR COSTS AND EXPENSES INCURRED, INCLUDING ATTORNEYS' FEES AND ANY BOND PREMIUMS.

3. PROFESSIONAL NEGLIGENCE INDEMNIFICATION. SERVICE PROVIDER SHALL REIMBURSE AND INDEMNIFY AND HOLD HARMLESS THE RTC INDEMNITEES FROM AND AGAINST ANY AND ALL ACTIONS ARISING OUT OF OR INCIDENT TO SERVICE PROVIDER'S PROFESSIONAL NEGLIGENCE IN THE PERFORMANCE OF THE SERVICES UNDER THIS CONTRACT. SERVICE PROVIDER SHALL NOT BE LIABLE HEREUNDER TO THE EXTENT THAT THE ACTION IS CAUSED BY THE SOLE NEGLIGENCE OF THE RTC AND OR THE RTC INDEMNITEES IN ACCORDANCE WITH APPLICABLE LAW REGARDING COMPARATIVE NEGLIGENCE. THE INDEMNIFICATION OBLIGATIONS PROVIDED BY SERVICE PROVIDER PURSUANT TO THIS CONTRACT SHALL NOT BE CONSTRUED AS BEING FOR THE BENEFIT OF ANY CONTRACTORS, SUB-CONSULTANTS/SUBCONTRACTORS OR MATERIAL SERVICE PROVIDERS.

4. INDEMNIFICATION NOT LIMITED BY WORKER'S COMPENSATION; DISABILITY BENEFITS ACT. ANY ACTIONS BROUGHT AGAINST ANY RTC INDEMNITEE BY AN EMPLOYEE OF SERVICE PROVIDER OR ANYONE DIRECTLY OR INDIRECTLY EMPLOYED BY IT OR ANYONE FOR WHOSE ACTS IT MAY BE LIABLE ARE INCLUDED IN THE INDEMNIFICATION OBLIGATIONS IMPOSED UPON SERVICE PROVIDER UNDER **SECTION 1** ABOVE AND SHALL NOT BE LIMITED BY ANY LIMITATION ON THE AMOUNT OR TYPE OF DAMAGES, COMPENSATION OR BENEFITS PAYABLE BY, OR ON BEHALF OF, SERVICE PROVIDER UNDER ANY WORKER'S COMPENSATION LAWS, DISABILITY BENEFITS ACTS OR ANY OTHER EMPLOYEE BENEFIT PROVIDED BY THIS CONTRACT OR BY LAW.

5. CORPORATE ENTITY LIABILITY. IT IS INTENDED BY THE PARTIES TO THIS CONTRACT THAT SERVICE PROVIDER'S SERVICES AND RTC'S PERFORMANCE IN CONNECTION WITH THE PROJECT SHALL NOT SUBJECT EITHER PARTY'S INDIVIDUAL EMPLOYEES, OFFICERS OR DIRECTORS TO ANY PERSONAL LEGAL EXPOSURE FOR THE RISKS ASSOCIATED WITH THIS PROJECT. THEREFORE, AND NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, THE PARTIES AGREE THAT ANY CLAIM, DEMAND OR SUIT SHALL BE DIRECTED AND/OR ASSERTED ONLY AGAINST RTC OR SERVICE PROVIDER, AND NOT AGAINST ANY OF THE RTC'S OR SERVICE PROVIDER'S INDIVIDUAL EMPLOYEES, OFFICERS OR DIRECTORS. NOTWITHSTANDING THE ABOVE WAIVER, RTC SHALL BE ALLOWED TO NAME SERVICE PROVIDER'S EMPLOYEES, OFFICERS OR DIRECTORS TO THE EXTENT LIABILITY ARISES FROM AN INDIVIDUAL'S RECKLESS OR INTENTIONAL ACTS.

6. TIMING OF OBLIGATIONS. SERVICE PROVIDER'S OBLIGATIONS TO INDEMNIFY, DEFEND AND HOLD HARMLESS RTC INDEMNITEES FROM AND AGAINST ACTIONS SHALL ARISE AT THE TIME THE ACTION BECOMES KNOWN BY RTC INDEMNITEES OR SERVICE PROVIDER, WHICHEVER OCCURS SOONER.

**E-9   PATENT INDEMNITY**

The Service Provider shall advise the RTC of any impending patent suit and provide all information available. The Service Provider shall defend any suit or proceeding brought against the RTC based on a claim that any product, or any part thereof, furnished under this Contract, constitutes an infringement of any patent; and, the Service Provider shall pay all damages and costs awarded therein, excluding incidental and consequential damages, against the RTC. In case said product, or any part thereof, is in such suit held to constitute infringement and use of said product or parts is enjoined, the Service Provider shall, at its own expense and at its option, either procure for the RTC the right to continue using said product or part, or replace same with non-infringing product, or modify it so it becomes non-infringing.

**E-10  SUCCESSORS AND ASSIGNS**

The RTC and the Service Provider, respectively, bind themselves, their partners, successors, assigns, and legal representatives to the other party to this Contract and to the partners, successors, assigns, and legal representatives of

such other party with respect to all covenants of this Contract. Neither party may assign their rights nor delegate their duties under this Contract without the written consent of the other party nor shall the Service Provider assign any money due or to become due without the prior written consent of the RTC, except to a financial institution authorized to do business in the state of Nevada. Such consent shall not be withheld unreasonably. Any assignment or delegation shall not relieve any party of its obligations under this Contract.

## E-11  WAIVER

Waiver of any of the terms of this Contract shall not be valid unless it is in writing signed by each party. The failure of the RTC to enforce any of the provisions of this Contract, or to require performance of any of the provisions herein, shall not in any way be construed as a waiver of such provisions or to affect the validity of any part of this Contract, or to affect the right of the RTC to thereafter enforce each and every provision of this Contract. Waiver of any breach of this Contract shall not be held to be a waiver of any other or subsequent breach of this Contract.

## E-12  TAXES

The RTC is exempt from paying Sales and Use Taxes under the provisions of Nevada Revised Statutes 372.325(4), and Federal Excise Tax, under Registry Number 90-0036752. The Service Provider shall pay all taxes, levies, duties, and assessments of every nature and kind, which may be applicable to any Services under this Contract. The Service Provider shall make any and all payroll deductions required by law. The Service Provider agrees to indemnify and hold the RTC harmless from any liability on account of any and all such taxes, levies, duties, assessments, and deductions.

## E-13  COMPLIANCE WITH LAWS

(a)  The Service Provider in the performance of the obligations of this Contract shall comply with all applicable laws, rules, and regulations of all Federal, State, and local governmental authorities having jurisdiction over the performance of this Contract including, but not limited to, the Federal Occupational Health and Safety Act, and all state and federal laws prohibiting and/or relating to discrimination by reason of race, sex, age, religion or national origin.

(b)  If any discrepancy or inconsistency shall be discovered between this Contract and any law, ordinance, regulation, order or decree, Service Provider shall immediately report the same in writing to the RTC who will issue such instructions as may be necessary.

(c)  The Services shall comply with the Americans with Disabilities Act ("ADA") as amended to date. The Service Provider shall provide the Services in compliance with the ADA and the rules and regulations promulgated there under and shall immediately notify the RTC of any conflicts between the contract documents and the ADA or the rules and regulations promulgated there under.

## E-14  AUDIT OF RECORDS

(a)  The Service Provider agrees to maintain financial records pertaining to all matters relative to this Contract in accordance with standard accounting principles and procedures and to retain all records and supporting documentation applicable to this Contract for a period of three years after completion of this contract and any subsequent extensions thereof. All records subject to audit findings shall be retained for three years after such findings have been resolved. In the event the Service Provider goes out of existence, the Service Provider shall turn over to the RTC all of its records relating to this Contract to be retained by the RTC for the required period of time.

(b)  The Service Provider agrees to permit the RTC or the RTC's designated representative(s) to inspect and audit its records and books relative to this Contract at any time during normal business hours and under reasonable circumstances and to copy and/or transcribe any information that the RTC desires concerning Service Provider's operation hereunder. The Service Provider further understands and agrees that said inspection and audit would be exercised upon written notice. If the Service Provider or its records and books are not located within Clark

County, Nevada, and in the event of an inspection and audit, Service Provider agrees to deliver the records and books or have the records and books delivered to the RTC or the RTC's designated representative(s) at an address within Clark County, Nevada as designated by the RTC. If the RTC or the RTC's designated representative(s) find that the records and books delivered by the Service Provider are incomplete, the Service Provider agrees to pay the RTC or the RTC's representative(s)' costs to travel (including travel, lodging, meals, and other related expenses) to the Service Provider's offices to inspect, audit, retrieve, copy, and/or transcribe the complete records and books. The Service Provider further agrees to permit the RTC or the RTC's designated representatives to inspect and audit, as deemed necessary, all records of this project relating to finances, as well as other records including performance records that may be required by relevant directives of funding sources of the RTC.

(c) If, at any time during the term of this Contract, or at any time after the expiration or termination of the Contract, the RTC or the RTC's designated representative(s) finds the dollar liability is less than payments made by the RTC to the Service Provider, the Service Provider agrees that the difference shall be either: (1) repaid immediately by the Service Provider to the RTC or (2) at the RTC's option, credited against any future billings due the Service Provider.

## E-15  INDEPENDENT CONTRACTOR

(a) In the performance of Services under this Contract, the Service Provider, any other person employed by it, and any of its subcontractors or Service Providers shall be deemed to be an independent contractor and not an agent or employee of the RTC and they shall not be entitled to, nor will the RTC provide any of the benefits or rights afforded employees of RTC, including, but not limited to, sick leave, vacation leave, holiday pay, Public Employees Retirement System benefits, or health, life, dental, long-term disability or workers' compensation insurance benefits. The Service Provider shall be liable for the actions of any person, organization or corporations with which it subcontracts to fulfill this Contract. The RTC shall hold the Service Provider as the sole responsible party for the performance of this Contract. The Service Provider shall maintain complete control over its employees and all of its subcontractors. Nothing contained in this contract or any subcontract awarded by the Service Provider shall create a partnership, joint venture or agency with the RTC. Neither party shall have the right to obligate or bind the other party in any manner to any third party. Service Provider shall be solely responsible for, and shall indemnify, defend and hold RTC harmless from all matters relating to the payment of its employees, including compliance with social security, withholding, and all other wages, salaries, benefits, taxes, demands, and regulations of any nature whatsoever. Service Provider has or will retain such employees as it may need to perform the services required by this Contract. Such employees shall not be employed by the RTC.

(b) Payment of Taxes. The Service Provider agrees to pay all required taxes on amounts paid to the Service Provider under this Contract and to indemnify, defend, and hold the RTC harmless from any and all taxes, assessments, penalties, and interest asserted against the RTC by reason of the independent contractor relationship created by this Contract or by reason of the Service Provider's failure to pay taxes when due. In the event that the RTC is audited by any Federal or State agency regarding the independent contractor status of the Service Provider and the audit in any way fails to sustain the validity of an independent contractor relationship between the RTC and the Service Provider, then the Service Provider agrees to reimburse the RTC for all costs, including but not limited to, accounting and attorney's fees, arising out of such audit and any appeals relating thereto.

(c) Workers Compensation Compliance. The Service Provider shall fully comply with the workers' compensation laws applicable to the Service Provider and its employees. The Service Provider further agrees to indemnify, defend, and hold the RTC harmless from any failure of the Service Provider to comply with applicable workers' compensation laws. The RTC shall have the right to offset against any amounts otherwise due to the Service Provider under this Contract any costs incurred by the RTC resulting from any such failure to comply or resulting from Service Provider failure to promptly pay to the RTC any reimbursement or indemnification arising under this section.

## E-16  SUBCONSULTANTS/SUBCONTRACTORS

In general, this Contract or management of the Contract shall not be subcontracted, except with the prior, written approval of the RTC. In any case in which the Service Provider desires to subcontract, the Service Provider shall submit, for review and documentation purposes, a list of any and all subconsultants/subcontractors. The Service Provider shall be liable for the actions of any person, organization or corporations with which it subcontracts to fulfill this Contract. The Service Provider shall furnish at the RTC's request, a copy of the Service Provider's contract(s) with its subconsultants/subcontractors. The professional obligations of such persons shall be undertaken and performed in the interest of the RTC. All subcontracts will incorporate in full all appropriate conditions and terms as set forth in this Contract. The Service Provider will not enter into any subcontracts with any subconsultants/subcontractors not named in or pursuant to this Contract in writing, except with the prior written approval of the RTC's project manager. Any approval of a subcontract by the RTC shall not be construed as making the RTC a party to such subcontract, giving the subconsultants/subcontractors privity of contract with the RTC, or subjecting the RTC to liability of any kind to any subconsultants/subcontractors.

## E-17  FLOWDOWN

Service Provider shall provide that its contracts with subcontractor(s) shall be bound to the Service Provider in the same manner, and to the same extent, as the Service Provider is bound to the RTC under this CONTRACT.

## E-18  UNAUTHORIZED ALIENS

In accordance with the Immigration Reform and Control Act of 1986, the Service Provider agrees that it will not employ unauthorized aliens in the performance of this Contract, including Federal Conditions, if applicable.

## E-19  DISCRIMINATION

Service Provider acknowledges that the RTC has an obligation to ensure that public funds are not used to subsidize private discrimination. Service Provider recognizes that if they or their subcontractors are found guilty by an appropriate authority of refusing to hire or do business with an individual or Service Provider due to reasons of race, color, gender, ethnicity, disability, national origin, age, or any other protected status, the RTC may declare the Service Provider in breach of the Contract, terminate the Contract, and designate the Service Provider as non-responsible.

## E-20  FORCE MAJEURE

The Service Provider shall not be liable for any excess costs if the failure to perform the Contract arises from circumstances beyond the reasonable control and without the fault or negligence of the Service Provider. These circumstances are limited to such causes as (1) acts of God or of the public enemy, (2) acts of governmental bodies, (3) fires, (4) floods, (5) epidemics or pandemics, (6) civil disturbances, or (7) unusually severe weather; but does not include labor related incidents, such as strikes or work stoppages. The time of performance of the Service Provider's obligations under this Contract shall be extended by such period of enforced delay; provided, however, that such reasonably extended time period shall not exceed 60 days. If the foregoing circumstances result in a delay greater than 60 calendar days, the RTC may terminate the affected portion of the Contract pursuant to the terms of Paragraph E-4 (Termination for Convenience).

## E-21  MATERIALS, INFORMATION AND DOCUMENTS

All materials, information, and documents, whether finished, unfinished, or draft, developed, prepared, completed, or acquired by Service Provider for RTC relating to the Services to be performed hereunder and not otherwise used or useful in connection with services previously rendered or services to be rendered by Service Provider to parties other than RTC shall become the property of RTC and shall be delivered to RTC's representative upon completion or termination of this Contract, whichever comes first. Service Provider shall not be liable for damages, claims, and losses arising out of any reuse of any work products on any other project conducted by RTC. RTC shall have the right to reproduce all documentation supplied pursuant to this Contract.

## E-22  QUALITY OF SERVICES

(a) The Service Provider shall be responsible for the professional quality, technical accuracy, timely completion, and coordination of all services furnished by the Service Provider, its subcontractors and its principals, officers, employees, and agents under this Contract. In performing the specified Services, Service Provider shall follow practices consistent with generally accepted professional and technical standards.

(b) It shall be the duty of the Service Provider to assure that all products of its effort are technically sound and in conformance with all pertinent Federal, State, and Local statutes, codes, ordinances, resolutions, and other regulations.

(c) The Service Provider shall, without additional compensation, correct or revise any deficiencies, errors or omissions caused by the Service Provider in its analysis, reports, and Services. It is also understood and agreed by both parties that if any error is found, the Service Provider will expeditiously make the necessary correction, at no expense to the RTC, except when such error is the cause of the RTC.

(d) Service Provider will not produce a work product which violates or infringes on any copyright or patent rights. The Service Provider shall, without additional compensation, correct or revise any errors or omissions in its work products. Permitted or required approval by the RTC of any products or Services furnished by Service Provider shall not in any way relieve the Service Provider of responsibility for the professional and technical accuracy and adequacy of its Services. RTC's review, approval, acceptance, or payment for any of Service Provider's Services herein shall not be construed to operate as a waiver of any rights under this Contract or of any cause of action arising out of the performance of this Contract, and Service Provider shall be and remain liable in accordance with the terms of this Contract and applicable law for all damages to RTC caused by Service Provider's performance or failures to perform under this Contract.

## E-23 ASSUMPTION OF RISK

Any Services performed by the Service Provider under this Contract which require prior review and approval by the RTC shall be at the sole risk and expense of the Service Provider if such prior review and approval by the RTC is not obtained.

## E-24 RIGHT TO ADEQUATE ASSURANCE OF PERFORMANCE

When reasonable grounds for insecurity arise with respect to the performance of either party, the other may in writing demand adequate assurance of due performance and until it receives such assurance may, if commercially reasonable, suspend any performance for which it has not already received the agreed return. Acceptance of any improper delivery or payment does not prejudice the aggrieved party's right to demand adequate assurance of proper performance. After receipt of a justified demand, failure to provide within a reasonable time not exceeding thirty calendar days, such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the Contract.

## E-25 SEVERABILITY

The invalidity, illegality, or unenforceability of any provision of this Contract or the occurrence of any event rendering any portion or provision of this Contract void shall in no way affect the validity or enforceability of any other portion or provision of this Contract. Any void provision shall be deemed severed from this Contract, and the balance of this Contract shall be construed and enforced as if this Contract did not contain the particular portion or provision held to be void. The parties further agree to amend this Contract to replace any stricken provision with a valid provision that comes as close as possible to the intent of the stricken provision. The provisions of this clause shall not prevent this entire Contract from being void should a provision which is of the essence of this Contract be determined void.

## E-26 CONFORMING SERVICES

The Services performed under this Contract shall conform in all respects with the requirements set forth in this Contract. The Service Provider shall furnish the RTC with sufficient data and information needed to determine if the Services performed conform to all the requirements of this Contract.

**E-27  MODIFICATION/AMENDMENT**

    (a)  Notwithstanding any provision herein to the contrary, and pursuant to NRS 104.2306, the RTC reserves the right to request modification at any time to the (1) scope, complexity, character, location, frequency of the services to be performed; (2) Conditions under which the services are required to be performed; such as a change in standards or a change in available base data which would require additional work or services; (3) duration of work or services if the time period for completion of Services warrants such an adjustment; or (4) estimated quantities or the timing of the Service Provider's obligations under this Contract, in whatever manner the RTC determines, in good faith, to be reasonably necessary and to be in the best interests of the public. This Contract shall not be modified or amended except by the express written agreement of the parties, signed by a duly authorized representative for each party. No Services for which an additional compensation will be charged by the Service Provider shall be furnished without the written authorization of the RTC. Any other attempt to modify or amend this Contract shall be null and void and may not be relied upon by either party.

    (b)  Oral change orders will not be permitted. The Service Provider shall be liable for all costs resulting from, and/or for satisfactorily correcting, any specification change not properly ordered by written modification to the contract and signed by the RTC.

    (c)  Within seven (7) calendar days after receipt of the written change order to modify the contract, the Service Provider shall submit to the RTC a detailed cost of financial impact of the proposed change (on both the Service Provider and the RTC), the feasibility of the change, schedule proposal, and the impact of the proposed change on the goods provided or services performed under this Contract. Following the RTC's review of the change proposal information provided by the Service Provider the RTC may: (A) direct the Service Provider to implement the Contract change as specified in the original notice; (B) direct the Service Provider to implement the proposed change with modifications; or (C) withdraw the proposed change.

    (d)  The Service Provider shall provide current, complete, and accurate documentation to the RTC in support of any equitable adjustment. Failure to provide adequate documentation, within a reasonable time after a request from the RTC, will be deemed a waiver of the Service Provider's right to dispute the equitable adjustment proposed by the RTC, where such equitable adjustment has a reasonable basis at the time it is determined by the RTC.

    (e)  If the Service Provider's proposal includes the cost of property made obsolete or excess by the change, the RTC shall have the right to prescribe the manner of the disposition of the property

    (f)  A change order proposal shall be subject to negotiations between the Service Provider and the RTC. After the proposal is accepted by the Governing Body, a detailed modification shall be executed in writing by both parties. Disagreements that cannot be resolved within negotiations shall be resolved in accordance with the procedures specified in Paragraph E-1 (Disputes).

**E-28  ENTIRE CONTRACT**

    This Contract represents the entire and integrated Contract between the RTC and the Service Provider. It supersedes all prior and contemporaneous communications, representations, and agreements, whether oral or written, relating to the subject matter of this Contract. This Contract may not be amended, nor any provision or breach hereof waived, except in a writing signed by the parties which expressly refers to this Contract. Amendments on behalf of the RTC will only be valid if signed by the Chair of the RTC's Governing Body, or as delegated to the CEO.

**E-29  SECTION AND PARAGRAPH HEADINGS**

    The section and paragraph headings appearing in this Contract are inserted for the purpose of convenience and ready reference. They do not purport to define, limit or extend the scope or intent of the language of the sections and paragraphs to which they pertain.

**E-30  CONFLICT OF INTEREST**

(a) An official of the RTC, who is authorized in such capacity and on behalf of the RTC to negotiate, make, accept or approve, or take part in negotiating, making, accepting, or approving this Contract, payments under this Contract, or Services under this Contract, shall not be directly or indirectly interested personally in this Contract or in any part hereof. No officer, employee, architect, attorney, engineer or inspector of, or for the RTC, who is authorized in such capacity and on behalf of the RTC to exercise any legislative, executive, supervisory or other similar functions in connection with this Contract, shall become directly or indirectly interested personally in this Contract or in any part hereof, any material supply contract, subcontract, insurance contract, or any other contract pertaining to this Contract.

(b) Each party represents that it is unaware of any financial or economic interest of any public officer or employee of the RTC relating to this Contract. Notwithstanding any other provision of this Contract, if such interest becomes known, the RTC may immediately terminate this Contract for default or convenience, based on the culpability of the parties.

(c) The Service Provider warrants that no person or selling agency has been employed or retained to solicit or secure this Contract upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bona fide permanent employees. For breach or violation of this warranty, the RTC shall have the right to annul this Contract without liability or in its discretion to deduct from the Contract price or consideration or otherwise recover the full amount of such commission, percentage, brokerage, or contingent fee.

(d) In the event this Contract is terminated as provided for in this Section, the RTC shall be entitled:

    1. To pursue the same remedies against the Service Provider as it could pursue in the event of a breach of this Contract by the Service Provider; and

    2. As a penalty, in addition to any other damages to which the RTC may be entitled by law, to exemplary damages in an amount as determined by the RTC which shall not be less than three nor more than ten times the costs incurred by the Service Provider in providing any such gratuities to any such officer or employee.

    3. The rights and remedies of the RTC provided in this section shall not be exclusive and are in addition to any other rights and remedies provided by law or under any other provision of this Contract.

## E-31 PUBLIC RECORDS

The RTC is a commission as defined by state law. As such, it is subject to the Nevada Public Records Law (Chapter 239 of the Nevada Revised Statutes). All of the RTC's records are public records, which are subject to inspection and copying by any person (unless declared by law to be confidential). This Contract, all supporting documents, and proposals submitted under the original Request for Proposal (if applicable) are deemed to be public records.

## E-32 CONFIDENTIALITY

(a) All information, including but not limited to, oral statements, computer files, databases, and other material or data supplied to the Service Provider is confidential and privileged. The Service Provider shall not disclose this information, nor allow to be disclosed to any person or entity without the express prior written consent of the RTC. The Service Provider shall have the right to use any such confidential information only for the purpose of providing the services under this Contract, unless the express prior, written consent of the RTC is obtained. Upon request by the RTC, The Service Provider shall promptly return to the RTC all confidential information supplied by the RTC, together with all copies and extracts.

(b) The confidentiality requirements shall not apply where (i) the information is, at the time of disclosure by the RTC, then in the public domain; (ii) the information is known to the Service Provider prior to obtaining the same from the RTC; (iii) the information is obtained by the Service Provider from a third party who did not receive the same directly or indirectly from the RTC; or (iv) the information is subpoenaed by court order or other legal process, but in such event, the Service Provider shall notify the RTC. In such event the RTC, in its sole discretion, may

seek to quash such demand.

(c)  The obligations of confidentiality shall survive the termination of this Contract.

## E-33  MEDIA AND MARKETING RESTRICTIONS

(a)  The Service Provider may not publish or sell any information from or about this Contract without the prior written consent of the RTC, which consent may be withheld in RTC's sole discretion.  This restriction does not apply to the use of the RTC's name in a general list of customers, so long as the list does not represent an express or implied endorsement of the Service Provider or its Services.

(b)  The Service Provider, its affiliates, and representatives shall not publicly disclose, issue any press release, or make any other statement, or otherwise communicate with the media concerning this Contract or the subject matter hereof, except and to the extent the Service Provider is required to make a public disclosure by applicable law or in connection with enforcing its rights under the Contract. If the Service Provider is required to make a disclosure they shall consult with the RTC regarding the substance of the required disclosure and provide a reasonable opportunity to review and comment on the required disclosure prior to its publication or filing. The Service Provider shall be liable for any failure of its affiliates or representatives to comply with the restrictions set forth under this Section.

## E-34  LACK OF FUNDS

The entering into of the Contract by the RTC is subject to its receipt of local and federal funds adequate to carry out the provisions of the Contract in full.

The RTC may cancel or reduce the amount of Services to be rendered if the RTC determines that such action is in the RTC's best interest, or that there will be a lack of funding available for the Service.  In such event, the RTC will notify the Service Provider in writing in 30 calendar days in advance of the date such cancellation or reduction is to be effective.

## E-35  ELECTRONIC SIGNATURE

This Contract and related documents may be executed by the parties separately in any number of counterparts, each of which shall be deemed to be the original, and all of which together shall constitute one and the same instrument. Each will be considered signed when the signature of a party is delivered by facsimile, electronic signature or electronic (email) transmission to the other party, when it is delivered in a manner that reasonably identifies the signatory as the individual named. Such electronic signatures shall be treated in all respects as having the same effect as an original signature. If requested by either party, documents bearing original signature may be subsequently submitted to replace copies bearing electronic signatures. By signing this Contract, the representative of the Service Provider thereby represents thatsuch person is duly authorized by the Service Provider to execute this Service Provider on behalf of the Service Provider and that the Service Provider agrees to be bound by the provisions thereof.

## E-36  ORGANIZATIONAL CONFLICT OF INTEREST

(a)  An Organizational Conflict of Interest (OCI) exists when a person or business entity has an unfair competitive advantage because of other activities or relationships with other persons. An OCI exists when any of the following circumstances arise:

i.  Lack of Impartiality or Impaired Objectivity – when the supplier is unable, or potentially unable, to provide impartial and objective assistance or advice to the RTC due to other activities, relationships, contracts, or circumstances.

ii.  Unequal Access to Information – The supplier has an unfair competitive advantage through obtainingaccess to nonpublic information during the performance of an earlier contract.

        iii.    <u>Biased Ground Rules</u> – During the conduct of an earlier procurement, the supplier has established the ground rules for a future procurement by developing the specifications, evaluation factors, or similar documents.

(b)  The Service Provider warrants that, to the best of his/her/its knowledge and belief, and except as otherwise disclosed, there are no relevant facts or circumstances, which could give rise to an OCI and that it will not, by this contract, participate in any activity which will give rise to an OCI for a future contract. The Service Provider understands that, if after award, an OCI is discovered, an immediate and full disclosure in writing must be made to the RTC, which must include adescription of the action, which the Service Provider has taken to proposes to take to avoid or mitigate such conflicts. If an OCIis determined to exist, the RTC may, it its discretion, cancel the contract award.  In the event the successful supplier was aware of an OCI prior to the award of the contract and did not disclose the conflict to the Purchasing Representative, the RTC may terminate the contract for default. The provisions of this clause must be included in all subcontracts for work or services to be performed similar to the service provided by the prime supplier, and the terms "contract", "supplier", and "Purchasing Representative" modified approximately to preserve the RTC's rights.

## SECTION F – LIST OF ATTACHMENTS/EXHIBITS

The following attachments are hereby incorporated into this Contract:

| Identifier | Title/Text Reference |
|---|---|
| Exhibit A | Scope of Services |
| Exhibit B | Fee Schedule and Delivery Schedule |
| Exhibit C | Insurance Requirements |
| Exhibit D | Federal Conditions |

(REMAINDER OF PAGE INTENTIONALLY LEFT BLANK)

CONTRACT NO. 20-014AV
GOMED AV VEHICLE TECHNOLOGY

IN WITNESS WHEREOF, the individuals who have affixed their signatures below certify and attest each is empowered to execute this Contract and act on behalf of and bind the party in whose name this Contract is executed the day and year first written above.


PERRONE ROBOTICS, LLC

By: _John Mottola_____

     JOHN MOTTOLA

     Chief Operating Officer


REGIONAL TRANSPORTATION COMMISSION OF SOUTHERN NEVADA

By: _____

     RTC CHAIR


APPROVED AS TO FORM:

By: _David Clyde_____

     RTC Legal Counsel


ATTEST:

By: _____

     MARIN DUBOIS

     Government Affairs Supervisor

Docusign Envelope ID: E9249547-8E47-4503-9CB6-95E212073368
Page 26 of 53

Case 2:25-cv-00247-CDS-MDC    Document 1    Filed 02/05/25    Page 39 of 66

CONTRACT NO. 20-014AV
GOMED AV VEHICLE TECHNOLOGY
EXHIBIT A – SCOPE OF SERVICES

## EXHIBIT A – SCOPE OF SERVICES

The following definitions apply to the scope of services:

1) "Software" means (i) the software supplied by the Service Provider, including the MAX® software platform, MAX® software drivers, plug-ins, and extensions, including any derivative works.
2) "Hardware" means the hardware, system, components and/or parts including any derivative works provided by the Service Provider, and shall specifically exclude Software.
3) "TONY™ AV Kit" means the combination of Hardware, Software, and electronic and mechanical components that constitute the retrofit kit including any derivative works that gives autonomy to a stock vehicle.
4) "Platform" means the Hardware, Software, and TONY™ AV Kit.
5) "Documentation" means any printed or electronic user manuals and documentation regarding the Products that the Service Provider will make available to the RTC.
6) "Products" mean the Hardware, Software, TONY™ AV Kit, and Documentation.

As between RTC and Service Provider, this Contract does not transfer any ownership over any right, title, and interest, including all intellectual property rights, in or to the Software and Documentation, including all updates, upgrades, error corrections, bug fixes, extensions, modifications and other derivative works or improvements to the Software and any updates, corrections, revisions or derivative works to the Documentation made by Service Provider to the RTC or any third party. This Contract does not transfer any ownership of any intellectual property rights in or to the design of the Hardware or any technology embedded therein (including modifications to the Hardware design), including sensor mounting and configuration design, and the design of any drop-in or bolt-in autonomy kit, and all other intellectual property rights to the Hardware design and technology to the RTC or any third party.

The AVs must be operated within the specific Operational Design Domain ("ODD") that the parties agree to and within the limits established by applicable laws and traffic rules.

The Products, including the Software, and any other materials and information provided by the Service Provider to RTC hereunder, whether orally, in writing, or by inspection of tangible objects, including without limitation technical data, research, product plans, or know-how may constitute and contain proprietary and confidential information of the Service Provider ("Service Provider Confidential Information") but are subject to the confidentiality provisions in this Contract, including Sections E-31 and E-32. Without limitation to any other provision in this Contract, Service Provider shall expressly identify and mark all materials and information that it does not believe to be subject to Section E-31.

Without limitation to any other provision in this Contract, the Service Provider's warranties under this Contract extend to the Products.

## GOMED AUTONOMOUS VEHICLE TECHNOLOGY

### 1.0    Introduction

The GoMed Project is a comprehensive, advanced mobility program that involves the deployment of emergent technologies to create safer and more efficient ways for people to travel to, from, and within the Las Vegas Medical District (LVMD). The LVMD is located within the City of Las Vegas' vibrant and revitalized downtown in the heart of the Las Vegas Metropolitan area. It covers 684 acres of critical medical facilities, including four hospitals that handle almost 200,000 patient visits annually. It is a home for clinics, medical offices, pharmacies, imaging, diagnostics, health administrative offices, and seven institutions of higher learning. The LVMD is directly adjacent to major freeways I-15 and U.S. 95, and its core area is bounded by Charleston Boulevard, Rancho Drive, Alta Drive, and Martin Luther King Boulevard. The LVMD is connected to the Bonneville Transit Center (BTC) via West Bonneville Avenue.

The Regional Transportation Commission of Southern Nevada (RTC) and its partners are interested in deploying autonomous vehicle (AV) technology to evaluate the ability of this technology and associated vehicles to operate on public roadways in mixed-flow traffic in Las Vegas, to enhance the mobility of residents and visitors, and to satisfy the specific operating purpose for which the service is intended. Further, RTC is interested in better understanding the infrastructure required to implement and support the operation of this technology, the approach to public adoption, the types and value of data

Docusign Envelope ID: E9249547-8E47-4503-9CB6-955212073368
Page 27 of 53

Case 2:25-cv-00247-CDS-MDC     Document 1     Filed 02/05/25     Page 40 of 66

CONTRACT NO. 20-014AV
GOMED AV VEHICLE TECHNOLOGY
EXHIBIT A – SCOPE OF SERVICES

produced, and the benefits derived from using AVs. RTC seeks a solution provider responsible for supplying AV technology and retrofitting existing RTC 'ARBOC - Spirit of Mobility' transit vehicles. AV technology performance shall be recorded, including time in service, miles traveled, high-accuracy positioning, speed, number of and reasons for autonomous driving disengagements, hard braking, evasive maneuvers, and more.

This AV technology is intended to operate on public roadways in mixed-flow traffic and operate nine (9) hours daily at a minimum of 8-minute headways in the rapidly developing Las Vegas Medical District area and emerging Downtown. Human operators (i.e., safety operators provided by others) will be available onboard each vehicle during operations to monitor the vehicle, explain the technology to passengers, and take control of the operation of the vehicle as needed.

This project will benefit the surrounding community by demonstrating the potential of this emerging technology to local stakeholders and the public, allowing for an educational experience while also inspiring quicker adoption of future innovations. It is expected that the selected AV Technology Provider shall enable the delivery of a safe and high-quality rider experience, increasing user adoption and promoting the activity and capabilities of the service.

This Request for Proposal (RFP) is issued by the RTC to solicit written proposals from qualified AV Technology Providers to provide and retrofit AV technology to existing RTC 'ARBOC - Spirit of Mobility' transit vehicles for the GoMed Project. The AV Technology Provider shall provide and install automated driving technology on four (4) existing RTC 'ARBOC - Spirit of Mobility' transit vehicles. The AV technology is to be ready for revenue service prior to April 2026 after successful integration, testing, and Final Acceptance by the RTC. To achieve this, the AV Technology Provider shall provide and install the four (4) sets of AV technology prior to April 2025 for sub-system testing, factory acceptance testing, system acceptance testing, burn-in, and Final Acceptance, as discussed in **Section 10**. The RTC desires a warranty and service and support for a period of four (4) years following Final Acceptance.

Respondents shall certify that the AV technology shall comply with federal Buy America and not impede the 'ARBOC - Spirit of Mobility' vehicle compliance with Americans with Disabilities Act (ADA), and Federal Motor Vehicle Safety Standards (FMVSS) requirements, and all other requirements.

The AV Technology Provider shall be responsible for meeting all requirements and specifications in this document, including necessary data interfaces between the AV technology and (1) the RTC Data Hub (provided by the RTC), (2) the connected vehicle Roadside Units, and (3) the Smart Transit Shelters, as discussed in **Section 8**. The latter two will be provided by a separate contractor (hereinafter referred to as the GoMed Intelligent Transportation Systems (ITS) Contractor). It is anticipated the GoMed ITS Contract will be awarded before the award of this contract.

Software, hardware, firmware, and/or technology replacements and upgrades necessary to ensure the AV technology continues to meet the requirements of the contract during the term of the warranty shall be included in the service and support from the AV Technology Provider.

*2.0     Project Location*

The LVMD is directly adjacent to major freeways I-15 and U.S. 95, and its core area is bounded by Charleston Boulevard, Rancho Drive, Alta Drive, and Martin Luther King Boulevard. The LVMD is connected to the BTC via West Bonneville Avenue. **Figure 1** highlights the LVMD area in a light gray color. AVs shall connect the BTC in Downtown Las Vegas to the LVMD for an approximate 3.8-mile circulator route, as indicated by the blue route in **Figure 2**, with full route information included in Attachment E, Operational Design Domain (ODD).

Docusign Envelope ID: E92495473-8E47-4503-9CB6-95E212073368
Page 28 of 53

Case 2:23-cv-00247-CDS-MDC    Document 1    Filed 02/05/25    Page 41 of 66

CONTRACT NO. 20-014AV
GOMED AV VEHICLE TECHNOLOGY
EXHIBIT A – SCOPE OF SERVICES

**Figure 1**. Las Vegas Medical District Site Location



**Figure 2**. GoMed Diagram, AV Route, and Route Description



### 3.0    General Requirements

AV Technology Provider shall retrofit four (4) RTC-provided 'ARBOC - Spirit of Mobility' transit vehicles for the program. Attachment B contains the technical specifications of the RTC 'ARBOC - Spirit of Mobility' transit vehicles. The AV standards, requirements, and specifications that the AV Provider shall follow are contained in **Section 7** of this document and Attachment A. **Section 8** of this document also provides further details associated with the RTC Interfaces and Equipment.

Case 2:25-cv-00247-CDS-MDC    Document 1    Filed 02/05/25    Page 42 of 66

Attachment C provides the RTC Data Hub details for reference only. Attachment D provides the standards and design criteria the AV Technology Provider shall follow.

**4.0      Shipping and Logistics**

The AV Technology Provider shall arrange and manage the shipping of the four (4) 'ARBOC - Spirit of Mobility' transit vehicles to their facility for retrofitting. The AV Technology Provider shall undertake pre-assembly/pre-production coordination and meetings with the project team and RTC. Following retrofitting the AV technology and the systems testing detailed in **Section 10**, the completed vehicles shall be shipped to the RTC facility for post-delivery and On-Site testing. The AV Technology Provider shall be responsible for all costs associated with shipping to and from their facility.

Testing of the retrofitted 'ARBOC - Spirit of Mobility' transit vehicles, including safety verification, shall be conducted at the AV Technology Provider's site facility before shipping to RTC. Refer to Attachment A, Specification No. AV-11

**5.0      Coordination**

The AV Technology Provider shall coordinate with both the RTC and the ITS Contractor to ensure that all required interfaces from the AV technology meet the requirements in **Section 8** and testing per **Section 10**.

**6.0      Compliance and Licensing**

- The AV Technology Provider shall certify the AV operation is compliant to operate on public roads at the Federal, State, and local levels.
- The AV Technology Provider shall provide any required certification of the AV technology under Federal, State, and local requirements.
- The AV Technology Provider shall provide any licensing of the AV technology under Federal, State, and local requirements.

**7.0      AV Specifications**

The AV retrofit technology shall be a comprehensive autonomous driving system comprised of all necessary systems, hardware, software, and compute power to enable a vehicle to operate autonomously.

The AV technology shall enable the vehicle to stop at the nine scheduled stops along the Route, allowing passengers to board and alight.

The AV technology shall have the capability to operate the vehicle safely on public roads at the posted legal speed limit in autonomous mode, with mixed traffic following the pre-defined route shown and described in **Figure 2** above and as further detailed by the Operational Design Domain (ODD), Attachment E.

The required key components of a comprehensive autonomous driving system are as follows:

**Perception System:** A perception system shall include a combination of cameras, Light Detection and Ranging (LiDAR), radar, and other sensors that gather data about the vehicle's environment, such as road conditions, traffic, pedestrians, bicyclists, other vehicles, etc. The data collected by these sensors is processed by software algorithms to generate a 3D representation of the vehicle's surroundings.

**Localization/Navigation System:** A localization/navigation system shall determine the vehicle's position relative to its surroundings (utilizing sensors, Global Positioning System (GPS), map data, etc.), enabling the vehicle to accurately determine its precise location to navigate, and to follow a predetermined route and stay on-course.

**Planning and Decision-Making System**: A planning and decision-making system shall use the data collected by the perception and localization/navigation systems to make decisions about how the vehicle should maneuver to reach its destination. This system shall include algorithms determining the vehicle's speed, acceleration, and steering.

**Control System:** A control system shall include hardware and software that controls the vehicle's acceleration, braking, and steering. This system shall use data from the planning and decision-making system to adjust the vehicle's movements as necessary.

**Data Management System:** The data management system shall include the capabilities of storing, processing, and analyzing the data collected by the perception and localization/navigation systems. This shall consist of software algorithms that analyze the data to identify obstacles, predict traffic patterns, and make decisions about how the vehicle should operate. This also enables the monitoring, evaluation, and improvement of autonomous driving performance and safety.

**Safety Systems:** A range of safety systems shall include collision detection and avoidance, emergency stop, and fail-safe mechanisms to ensure the safety of passengers, pedestrians, cyclists, and other vehicles on the road and that the vehicle can operate safely in all conditions.

**Computing Hardware**: The computing hardware shall include the processors, memory, and other components that power the autonomous driving system. This hardware shall be sufficiently robust and powerful to process large amounts of data in real-time and make decisions quickly.

Within the prescribed Route, the AV technology shall:

- Operate safely in auto or manual mode.
- Have the appropriate systems to stop the vehicle promptly in a manner that does not injure onboard passengers or those in the vicinity of the vehicle.

Docusign Envelope ID: E9249547-8E47-4503-9CB6-955212073368
Page 30 of 53

Case 2:25-cv-00247-CDS-MDC    Document 1    Filed 02/05/25    Page 43 of 66

CONTRACT NO. 20-014AV
GOMED AV VEHICLE TECHNOLOGY
EXHIBIT A – SCOPE OF SERVICES

- Enable the vehicle to cross signalized intersections under these conditions: (1) automated drive in full connected vehicle mode (both at intersections with or without an RSU) or (2) manual drive mode, when AV mode has been disengaged due to safety issues or procedural requirements (no signal connection required).
- Utilize sufficient detection equipment to monitor a 360-degree operational design domain.
- Stop the vehicle in a safe location by executing a minimal-risk maneuver as per Society of Automotive Engineers (SAE) J3016
- Alert onboard and remote operators of connected vehicle connection interruption (within 0.5 seconds) and allow for takeover or enter minimal risk condition.
- Allow a human operator (i.e., safety operator) to disengage autonomous operation and immediately stop the vehicle through a simple, secure, and accessible disengage feature and/or depressing of the brake pedal.
- Operate the vehicle safely under temporary changes in traffic and roadway conditions, such as construction zones within the established ODD. e.g., the safety driver will manually take over.
- Operate the vehicle safely along terrains with different characteristics (e.g., slope, curvature, surfacing). (Within ODD, see Attachment E)
- Navigate the vehicle safely under various but defined ranges of conditions. (e.g., air temperature, wind, glare, rain, etc., without obscuring the vehicle's sensors.)
- Detect and enable the vehicle to react to hazards (e.g., stationary or moving objects) to operate safely within 600 milliseconds or as per applicable technical standards.
- Send alerts under fault conditions, such as when repair/maintenance is required, in order to notify the onboard safety operator to intervene as necessary.
- Stop at all defined transit stop locations and await confirmation from the safety operator that it is clear to proceed.

Other general requirements of the AV technology include:
- AV technology shall provide secure data access and have Dedicated Short-Range Communications (DSRC) / Cellular Vehicle-to-Everything (C-V2X) onboard units/antennae to communicate with roadside equipment.

The AV Technology Provider shall submit certifications that the AV Technology:
- Complies with the Federal Transit Administration's Buy America requirements.

### 8.0    RTC INTERFACES
#### 8.1    Description
This section addresses the interfaces to RTC systems, including other components of the GoMed Project, and the technology components and communication interfaces to be installed, integrated, and tested with other RTC systems. The AV Technology Provider shall provide Application Programming Interface (API) access to the required data for RTC to ingest.
#### 8.2    Road Side Unit (RSU) Interface
It shall be the responsibility of the AV Technology Provider to coordinate with the RTC to directly interface with the RSUs to receive supplementary data from the traffic signals and Pedestrian Detection information as specified in Attachment A, Specification No. AV-09.

The AV Technology Provider shall ensure all four (4) AV vehicles include the On-Board Unit (OBU) and communication devices to enable C-V2X communication and integration in compliance with various nationally established SAE and National Transportation Communications ITS Protocol standards.  They shall be equipped with a dual-mode C-V2X/DSRC OBU and jointly integrated with RTC to communicate with the RSU along the designated AV route. The AV OBU shall communicate with the dual mode RSU provided by the ITS contractor along the AV route, using the AV-mounted C-V2X/DSRC antennas per established connected vehicle protocols. The following shall be the minimum requirements:
- AV shall include integrated antennas supporting GPS and DSRC/C-V2X communications. The antenna shall be mounted on the AV top with a clear view of the road ahead and behind the vehicle.
- AV OBU shall receive Signal Phase and Timings (SPaT) and intersection map (MAP) messages per SAE J2735. The OBU will use SPaT and MAP to gain information about the intersection signal phase and timing when OBU is in a range of the RSU communication.
- Traveler Information Messages (TIM) and Personal Safety Messages (PSM) will be available to the AV OBU. The TIM messages will contain speed limit information. Where Pedestrian Detection Systems are installed, the PSM messages will indicate the presence of pedestrians in a crosswalk.

- AV OBUs shall support interface to Security Credential Management System (SCMS) and the ability to transmit/receive messages utilizing the Institute of Electrical and Electronics Engineers (IEEE) 1609.2 security standard.

### 8.3     *Smart Transit Shelter Passenger Interface*

The AV technology shall be capable of receiving information transmitted from the Smart Transit Shelter (STS) of the presence of passengers waiting at the STS. This information shall be used to comply with Attachment A, Specification No. AV-08 for the capability of autonomously stopping at designated transit stops only when passengers are waiting based on information received from the Smart Transit Shelter. The ability to enable and disable this capability shall be provided.  This interface shall be coordinated directly with RTC Information Technology (IT) staff in association with the RTC AV Interface.

### 8.4     *RTC Data Hub Interface*

The AV Technology Provider shall provide a documented API interface to enable direct interface with the RTC Data Hub. The AV Technology Provider shall coordinate with RTC IT staff to enable the pulling of the data required to provide all the information in Attachment A, Specifications No. AV-10, AV-13, AV-14, and AV-15

The schematic below shows the entire architecture of the RTC Data Hub.



The AV Technology Provider data requirements are highlighted in the red box within the above schematic. Attachment C - RTC Data Hub contains additional information for reference only.

### 8.5     *Communications*

The AV Technology Provider shall ensure the required wireless communications are installed to enable near-real-time data availability via the AV Technology Provider's API.

### 9.0     *Safety Certification*

The AV Technology Provider shall undertake on-premises safety testing at their facility and provide the relevant certification of the retrofitted vehicles. The AV Technology Provider shall provide a plan outlining the safety testing necessary to certify the vehicle.  The range of safety system tests shall include, but not be limited to, collision detection and avoidance,

Docusign Envelope ID: E9249547-8E47-4503-9CB6-955312073368
Page 32 of 53

Case 2:25-cv-00247-CDS-MDC    Document 1    Filed 02/05/25    Page 45 of 66

CONTRACT NO. 20-014AV
GOMED AV VEHICLE TECHNOLOGY
EXHIBIT A – SCOPE OF SERVICES

emergency stop, and fail-safe mechanisms to ensure the safety of passengers, pedestrians, cyclists, and other vehicles on the road.

## 10.0    Integration and Testing

The AV Technology Provider shall comply with the testing and integration specifications of the various components described herein. The AV Technology Provider shall be required to develop a test plan and requirement traceability verification matrix (RTVM), which maps the verification of each requirement to the testing levels. Four levels of testing shall be required, namely, sub-system, factory acceptance, system acceptance testing, and burn-in testing. Each level of testing shall be completed, documented, and signed off before the commencement of the next test level.

### 10.1    Test Plan

Within 90 days after the Notification to Proceed (NTP), the AV Technology Provider shall supply operational scenarios to RTC for review and approval. The operational scenarios, combined, shall demonstrate that the AV includes all the required capabilities and performs as required under all conditions described in **Section 7** and Attachment A. AV Technology Provider shall provide a detailed test plan(s), including the RTVM to the RTC for preparing and deploying the AV. The test plan shall be submitted after approval of the operational scenarios and 60 days before the scheduled start of testing and shall be reviewed and approved by the RTC or designated subject matter expert before the commencement of testing. It shall also be sufficiently comprehensive to demonstrate to the RTC that the AV technology meets or exceeds the specifications identified in this document and all appendices.  The AV Technology Provider shall provide a testing plan that includes the comprehensive testing and operational scenarios to be completed during the project deployment.

### 10.2    Testing levels

All tests shall be conducted as described in the approved Test Plan.  The information on testing in this section will also inform the preparation of the Test Plan. Each level of testing must be completed and accepted as complete by the RTC before proceeding to the next level of testing.

#### 10.2.1    Sub-System Test

This is a prelude to the factory acceptance testing in a mock live operational environment at the vendor's site test facility, using the installed system hardware and software. The test personnel shall concentrate on the satisfactory completion and verification of subsystem requirements and functionalities. Any issues encountered during the testing of individual system components shall be resolved independently of other testing.

At a minimum, the AV Technology Provider shall verify that the appropriate data flows between the AV technology and the RTC Data Hub, and between the AV technology and the RSUs is in the proper format and at the required frequency.

#### 10.2.2    Factory Acceptance Test (FAT)

The GoMed FAT shall be performed after all Sub-System Tests are completed. This level of testing shall verify specifications related to subsystem interactions, external interfaces, and system performance have been met. All system tests shall be performed in a mock live operational environment at the vendor's site test facility using all previously installed and tested system hardware and software.

The FAT shall include end-to-end full AV technology operational readiness and vehicle integration testing for 30 consecutive days to verify all operational aspects and functionalities. The FAT shall be conducted by the AV Technology Provider and overseen by an RTC representative. The FAT testing shall demonstrate that the AV technology performs correctly under the condition of all approved operational scenarios. Any FAT testing deficiencies shall be corrected before the AV Technology Provider proceeds to the System Acceptance Tests.

#### 10.2.3    System Acceptance Tests (SAT)

The GoMed system acceptance testing shall be performed after completed and accepted FAT testing. All system tests shall be performed in the live operational environment on the operational AV route in Las Vegas using the installed and tested system hardware and software.

The system acceptance test shall include the live on-site end-to-end full AV technology operational readiness and vehicle integration test of 30 consecutive days, without major or minor failure (as defined in **Section 10.2.5**), to verify all operational aspects and functionalities. The SAT shall be conducted by the AV Technology Provider and overseen by an RTC representative. The SAT testing shall demonstrate that the AV technology performs correctly under the condition of all approved operational scenarios. Any system acceptance testing deficiencies shall be corrected before the AV Technology Provider proceeds to the burn-in period.

In the event of a minor failure during the SAT, the AV Technology Provider shall replace or repair the equipment, and the SAT testing will be paused until the issue has been resolved and testing re-commences. In the event of a major failure during the SAT, the AV Technology Provider shall replace or repair the equipment, and the SAT testing will be stopped until the issue has been resolved, after which the 30-day testing period will restart.

#### 10.2.4    Burn-in and Final Acceptance

After the successful SAT, the AV technology shall be ready for the burn-in period of 60 consecutive days without major failure (as defined in **Section 10.2.5**) on the operational AV route. In addition to device control and using GoMed resources,

mock passenger operation, data collection, and archiving functions shall be checked for accuracy daily. Any issues during the burn-in period shall be documented and resolved so that the GoMed Burn-in testing runs normally without interruptions for the entire duration. If a minor failure occurs that does not affect the vehicle's autonomous operation, the RTC will review the failure and, at RTC's discretion, will allow continuation of the burn-in or halt the burn-in pending resolution of the failure. Any failure that impacts the autonomous operation of the vehicle will result in the termination of the burn-in period and restarting of the burn-in testing after the failure has been addressed. At the end of the successful Burn-in, Final Acceptance will be granted after submission and approval of the final test documentation. The test plan document shall be a living document which includes test results throughout all levels of testing, with any changes subject to RTC review and approval until the Burn-In is complete and the document is updated and signed off by the AV Technology Provider. It shall then be submitted to the RTC for approval as part of the request for Final Acceptance for the AV technology.

### 10.2.5    Failure Definitions
The following conditions constitute a **minor** system failure and shall result in suspension of the test:
- Failure of any single hardware or performance item to meet the operational requirements.


The following shall constitute a **major** system failure. Any one of the following conditions shall result in re-initialization of the test from day zero:
- Failure of any single hardware or performance item to meet the operational requirements more than once.
- More than three minor failures.


## 11.0    Documentation
The AV Technology Provider shall supply a full set of documentation to enable RTC to operate and maintain the AV technology-enabled vehicles as set out in this document. All documentation produced shall be submitted to the RTC in electronic format (.pdf) for review and approval. Upon approval, the AV Technology Provider shall provide hardcopies of documentation as noted below. The AV Technology Provider shall facilitate the coordination of safety and emergency procedures with all stakeholders and revise any documentation following any deficiencies recorded.
The documentation shall include but not be limited to:

- **Safety Procedures:** Prepare safety policies and procedures that are required for the project. A hardcopy of these procedures shall be held in the cabin of each AV vehicle, in the RTC control center, and at the Service desk.
- **Emergency Protocols:** Prepare any emergency protocols put in place for the AV project. A hardcopy of emergency protocols shall be held in the RTC control center, and 4 hardcopies shall be provided to RTC for distribution to Las Vegas Emergency Services. This shall be done in coordination with the Las Vegas Emergency Services, who will require training on the vehicle.
- **Maintenance Procedures:** Prepare the maintenance plan, including the schedule and maintenance activities required to be undertaken.
- **Training Material:** Prepare all training material required for **Section 12** and as specified in Attachment F.
- **Test Plan:** Prepare the test plan and test scenarios as per **Section 10**.
- **Warranties:** Prepare all material required as per **Section 13**.


## 12.0    TRAINING
All training shall be delivered in person at an on-site location provided by the RTC. The training shall include a test and certification issued to any attendee on completion of each course. AV Technology Provider shall provide updated documentation and deliver training after any material software or hardware upgrades have been made to the vehicles that may affect the vehicle's overall functionality. This training shall be certified by an independent SAE-qualified assessor to meet insurance requirements.
Following the completion of any part of the training, the AV Technology Provider shall provide to the RTC the test results and certificates of completion.
Detailed requirements for the training program are found in Attachment F.

### 12.1    RTC Management and Stakeholders
Training shall be provided to key RTC staff and stakeholders identified by RTC. The AV Technology Provider shall identify stakeholders that require training and manage and facilitate safety meetings, including but not limited to First Responders. They shall be trained to a general level of understanding as to how the vehicle operates and the key components of the vehicle. General overview documentation shall be provided to RTC so that all staff may receive an understanding of how the vehicle and technology work together.

### 12.2  *AV Maintenance*

Training shall be provided to RTC and appointed representatives for maintenance activities to enable the maintenance staff to undertake the required duties on the vehicles retrofitted with the AV technology.

- **AV Equipment**:  All maintenance technicians shall be trained on all third-party technology added to the vehicle so there is an understanding of how the vehicle, AV technology, and third-party software work together.
- **Fault Finding:** All relevant staff shall be trained to distinguish between errors incurred due to the vehicle mechanics and the AV technology. When AV technology is involved, the staff shall be trained to a standard that allows them to discuss possible errors and inform the AV Technology Provider with as much information as possible to diagnose the problem.  Repair of the problem shall be the responsibility of the AV Technology Provider under the service and support provisions.

### 12.3  *AV Operations*

The AV Technology Provider shall be responsible for training the RTC and RTC-designated personnel on all necessary operations of the AV technology.  All final testing of the AV associated with the "live" operation of the vehicle shall be conducted with trained safety operators onboard to meet the insurer's requirements.

- **Safety Operators:**  All RTC Operations and Maintenance (O&M) Service Provider's safety operators shall be trained and tested to a pre-agreed standard set out by RTC.
- **Operations Center:**  All RTC O&M Service Provider's AV operations staff shall be trained and tested.

### 13.0 Maintenance and Warranties

The AV Technology Provider shall deliver a defined maintenance plan, including a preventative maintenance schedule for the retrofitted AV technology components for the period of four (4) years post Final Acceptance.  Performance of defined maintenance shall be the responsibility of the AV Technology Provider under the service and support provisions.

The AV Technology Provider shall provide a warranty on all AV technology installed for four (4) years post Final Acceptance. This shall include but not be limited to any hardware, software, communications, machine/human interface, or vehicle control technology failure that impairs the operation of the vehicle in AV mode. For any vehicle components that require modification or replacement (e.g., vehicle steering system), the warranty shall include these vehicle components. The warranty shall cover all materials, labor, and shipping necessary for the repairs.

### 14.0 Replacements/Upgrades

Software, firmware, and/or technology replacements and upgrades necessary to ensure the vehicles continue to meet the AV Specifications during the warranty term shall be the responsibility of the AV Technology Provider under the service and support provisions.

Any such replacements/upgrades must be fully tested, certified, and accepted by the RTC before placing the vehicles back into service.

Unless such replacements/upgrades are being made due to a critical safety issue, the timing shall be staggered such that only one vehicle is out of service at a time.

CONTRACT NO. 20-014AV
GOMED AV VEHICLE TECHNOLOGY
EXHIBIT B – FEE SCHEDULE AND DELIVERY SCHEDULE

## EXHIBIT B – FEE SCHEDULE AND DELIVERY SCHEDULE

The not-to-exceed budget for all services, for the base term of this contract shall be **$2,392,000.00 (Two Million Three Hundred Ninety-Two Thousand Dollars and Zero Cents).** All costs associated with this contract and any other costs must come in, at, or under the budget amount.   Progress payments will be invoiced on percentage complete of each task for work completed the prior month.



| 1.1 | General Conditions | $250,000.00 |
| 1.2 | RTC Transit Vehicle Shipping and Logistics | $150,000.00 |
| 1.3 | Equipping/Retrofitting of RTC Transit Vehicles | $575,000.00 |
| 1.4 | Connected Vehicle On Board Units (OBUs) – 4 total | $117,000.00 |
| 1.5 | Autonomous Vehicle (AV) Technology – 4 total | $300,000.00 |
| 1.6 | Integration and Testing of Vehicles | $175,000.00 |
| 1.7 | Training | $75,000.00 |
| 1.8 | Maintenance Support and Warranties – Year 2 | $250,000.00 |
| 1.9 | Maintenance Support and Warranties – Year 3 | $250,000.00 |
| 1.10 | Maintenance Support and Warranties – Year 4 | $250,000.00 |

| Task Name | 2024 | | | | 2025 | | | | 2026 | | | | 2027 | | | | 2028 | | | | 2029 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 |
| GOMED Las Vegas | | | | | | | | | | | | | | | | | | | | | | | | GOM |
| Mobilization Activites | | | | | Mobilization Activites | | | | | | | | | | | | | | | | | | | |
| Vehicle and Hardware Procurement | | | | | Vehicle and Hardware Procurement | | | | | | | | | | | | | | | | | | | |
| Install & Unit Test Hardware | | | | | | Install & Unit Test Hardware | | | | | | | | | | | | | | | | | | |
| Install Software and QA Test System | | | | | | Install Software and QA Test System | | | | | | | | | | | | | | | | | | |
| Vehicles delivered to Las Vegas | | | ◇ | | | Vehicles delivered to Las Vegas | | | | | | | | | | | | | | | | | | |
| Setup Routes, Training and Testing in Las Vegas | | | | | | Setup Routes, Training and Testing in Las Vegas | | | | | | | | | | | | | | | | | | |
| Burn-In Period | | | | | | Burn-In Period | | | | | | | | | | | | | | | | | | |
| Final Acceptance | | | ◇ | | | ◆ Final Acceptance | | | | | | | | | | | | | | | | | | |
| Operations | | | | | | | | | | | | | | | | | | | | | | | | Oper |

CONTRACT NO. 20-014AV
GOMED AV VEHICLE TECHNOLOGY
EXHIBIT C – INSURANCE REQUIREMENTS

## EXHIBIT C – INSURANCE REQUIREMENTS

Cost: The Service Provider shall pay all associated costs for the specified insurance. The cost shall be included in the price(s).

The AV technology provider shall maintain in effect during the term of this Contract, including any warranty.

AV technology provider shall deliver to the Agency, within ten (10) days after receiving Notice of Award of this Contract, evidence of the above. Prior to the expiration of any insurance during the time required, the Supplier shall furnish evidence of renewal to the Agency's Contract Administrator.

1.  Format/Time:  The Service Provider shall provide RTC with Certificates of Insurance, per the attached sample format, for coverages as listed below, and endorsements affecting coverage required by this Contract within ten calendar days after the award by the RTC.  All policy certificates and endorsements shall be signed by a person authorized by that insurer.  All required aggregate limits shall be disclosed and amounts entered on the Certificate of Insurance and shall be maintained for the duration of the Contract and any renewal periods.

2.  Best Key Rating: The RTC requires insurance carriers to maintain during the contract term, a Best Key Rating of A- or higher, with a Financial Strength of VII or higher, which shall be fully disclosed and entered on the Certificate of Insurance.

3.  RTC Coverage: The RTC Indemnitees, their officers and employees must be expressly covered as additional insureds except on workers' compensation and professional liability insurance coverages.  The Service Providers' insurance shall be primary and non-contributory as respects the RTC, its officers and employees. The General Liability and Workers' Compensation policies shall include an endorsement waiving rights of subrogation by the insurer or insurers against RTC and any other parties required by the Contract Documents.

4.  Endorsement/Cancellation:  The Service Providers' general liability insurance policy shall be endorsed to recognize specifically the Service Providers' contractual obligation of additional insured to RTC and must note that the RTC will be given 30 calendar days advance notice of cancellations.

5.  Deductibles: All deductibles and self-insured retentions shall be fully disclosed in the Certificates of Insurance and may not exceed $50,000.

6.  Aggregate Limits: If aggregate limits are imposed on bodily injury and property damage, then the amount of such limits must not be less than $2,000,000.

7.  Commercial General Liability: The General Liability and Workers' Compensation policies shall include an endorsement waiving rights of subrogation by the insurer or insurers against RTC and any other parties required by the Contract Documents: Subject to Paragraph 6 of this exhibit, the Service Provider shall maintain limits of no less than $5,000,000 combined single limit per occurrence for bodily injury (including death), personal injury and property damages.  Commercial general liability coverage shall be on a "per occurrence" basis only, not "claims made," and be provided either on a Commercial General Liability or a Broad Form Comprehensive General Liability (including a Broad Form CGL endorsement) insurance form. Information that needs to be on the form is as follows (per occurrence):
    Policy Number
    Policy Effective Date
    Policy Expiration Date
    General Aggregate ($5,000,000)
    Products-Completed Operations Aggregate ($5,000,000)
    Personal & Advertising Injury ($5,000,000)
    Each Occurrence ($5,000,000)

Docusign Envelope ID: E9249547-8E47-4503-9CB6-955212073368

8. Automobile Liability:  Subject to Paragraph 6 of this exhibit, the Service Provider shall maintain limits of no less than $5,000,000 per occurrence, for a period of five (5) years after acceptance of the last AV retrofitted vehicle delivered under this Contract (Products Liability coverage may be effected through one or more excess liability policies), but not be limited to, coverage against all insurance claims for injuries to persons or damages to property which may arise from services rendered by Service Provider and any auto used for the performance of services under this Contract.  As an alternative to the specified any auto coverage, the RTC will accept all owned, non-owned and hired or symbols 2, 8 and 9. Information that needs to be on the form is as follows:

> Policy Number
> Policy Effective Date
> Policy Expiration Date
> Combined Single Limit ($5,000,000)

9. Excess/Umbrella: The limits of liability shall be on an occurrence basis and in an amount not less than **$1,000,000.00**. The policy shall provide coverage on the same basis as outlined for employers' liability, commercial general liability and auto liability.

10. Workers' Compensation: The Service Provider shall obtain and maintain for the duration of this contract, a work certificate and/or a certificate issued by an insurer qualified to underwrite workers' compensation insurance in the State of Nevada, in accordance with Nevada Revised Statutes Chapters 616A-616D, inclusive, provided, however, a Service Provider that is a sole proprietor shall be required to submit an affidavit (sample attached) indicating that the Service Provider has elected not to be included in the terms, conditions and provisions of Chapters 616A-616D, inclusive, and is otherwise in compliance with those terms, conditions and provisions. If any of the Services to be provided will be performed out of the state of Nevada, then any Workers Compensation policy must include an "all states endorsement" that provides for coverage in any state.  The endorsement must include the broadening of coverage to meet the applicable laws in that state. Information that needs to be on the form is as follows:

> Policy Number
> Policy Effective Date
> Policy Expiration Date
> WC Statutory Limits
> Employer's Liability Each Accident ($1,000.000)
> Employer's Liability Disease – Each Employee ($1,000,000)
> Employer's Liability Disease – Policy Limit ($1,000,000)

11. Additional Insurance: The Service Provider is encouraged to purchase any such additional insurance as it deems necessary.

12. Damages: The Service Provider is required to remedy all injuries to persons and damage or loss to any property of RTC, caused in whole or in part by the Service Provider its subcontractors or anyone employed, directed or supervised by Service Provider.

The RTC Indemnitees in no way warrant that the minimum limits contained herein are sufficient to protect Service Provider from liabilities that might arise out of the performance of the work and/or services under this Agreement by the Service Provider, its agents, representatives, employees, subcontractors or vendors and Service Provider is free to purchase such additional insurance as may be determined necessary.

Insurance coverage provided by the Service Provider shall not be limited to the liability assumed under the indemnification provisions of this Agreement.

13. Insurance Submittal Address:  All Insurance Certificates requested shall be sent to the RTC's third party insurance compliance tracking service provider, Insurance Tracking Services, Inc., RTCSNV@instracking.com and RTCPurchasing@rtcsnv.com.

The description of operations should reflect the below information:
Description: **Contract No. 20-014; Project Title: GOMED AUTONOMOUS TECHNOLOGY** (must be identified

on the initial insurance form and each renewal form).

The Certificate Holder portion should reflect the below information:
Regional Transportation Commission of Southern Nevada, its officers, employees and agents
C/O Insurance Tracking Services, Inc. (ITS)
P.O. Box 60840
Las Vegas, NV 89160

Failure To Maintain Coverage: If the Service Provider fails to maintain any of the insurance coverages required herein, RTC may withhold payment, order the Service Provider to stop the Services, declare the Service Provider in breach, suspend or terminate the Contract, assess liquidated damages as defined herein, or may purchase replacement insurance or pay premiums due on existing policies. RTC may collect any replacement insurance costs or premium payments made from the Service Provider or deduct the amount paid from any sums due the Service Provider under this Contract.

Notwithstanding anything to the contrary in the Agreement or in this Exhibit C, if the Service Provider has procured any insurance coverage and/or limits (either primary or on an excess basis) that exceed the minimum acceptable coverage and/or limits set forth in this Exhibit C or elsewhere in the Agreement, the broadest coverage and highest limits actually afforded under the applicable policy(ies) of insurance shall be considered the coverage and limits that are required by this Agreement and such coverage and limits shall be provided in full to the additional insureds and indemnified parties under this Agreement at no additional cost to RTC.

**EXHIBIT D – FEDERAL CONDITIONS**

## ACCESS TO RECORDS AND REPORTS

1. Record Retention. The Contractor will retain, and will require its subcontractors of all tiers to retain, complete and readily accessible records related in whole or in part to the contract, including, but not limited to, data, documents, reports, statistics, leases, subcontracts, arrangements, other third party Contracts of any type, and supporting materials related to those records. (a) A bid guarantee from each bidder equivalent to five percent of the bid price. The "bid guarantee" must consist of a firm commitment such as a bid bond, certified check, or other negotiable instrument accompanying a bid as assurance that the bidder will, upon acceptance of the bid, execute such contractual documents as may be required within the time specified.

2. Retention Period. The Contractor agrees to comply with the record retention requirements in accordance with 2 C.F.R. § 200.334. The Contractor shall maintain all books, records, accounts and reports required under this Contract for a period of at not less than three (3) years after the date of termination or expiration of this Contract, except in the event of litigation or settlement of claims arising from the performance of this Contract, in which case records shall be maintained until the disposition of all such litigation, appeals, claims or exceptions related thereto.

3. Access to Records. The Contractor agrees to provide sufficient access to FTA and its contractors to inspect and audit records and information related to performance of this contract in accordance with 2 CFR § 200.337.

4. Access to the Sites of Performance. The Contractor agrees to permit FTA and its contractors access to the sites of performance under this contract in accordance with 2 CFR § 200.337.

## AMERICANS WITH DISABILITIES ACT(ADA)

The contractor agrees to comply with all applicable requirements of section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794, which prohibits discrimination on the basis of handicaps, with the Americans with Disabilities Act of 1990 (ADA), as amended, 42 U.S.C. §§ 12101 et seq., which requires that accessible facilities and services be made available to persons with disabilities, including any subsequent amendments to that Act, and with the Architectural Barriers act of 1968, as amended, 42 U.S.C. §§ 4151 et seq., which requires that buildings and public accommodations be accessible to persons with disabilities, including any subsequent amendments to that Act. In addition, the contractor agrees to comply with any and all applicable requirements issued by the FTA, DOT, DOJ, U.S. GSA, U.S. EEOC, U.S. FCC, any subsequent amendments thereto and any other nondiscrimination statute(s) that may apply to the Project.

## BUY AMERICA REQUIREMENTS

The contractor agrees to comply with 49 U.S.C. 5323(j) and 49 C.F.R. part 661 and 2 CFR § 200.322 Domestic preferences for procurements, which provide that Federal funds may not be obligated unless all steel, iron, and manufactured products used in FTA funded projects are produced in the United States, unless a waiver has been granted by FTA or the product is subject to a general waiver. General waivers are listed in 49 C.F.R. § 661.7.

Construction materials used in the Project are subject to the domestic preference requirement of the Build America, Buy America Act, Pub. L. 117-58, div. G, tit. IX, §§ 70911 – 70927 (2021), as implemented by the U.S. Office of Management and Budget, the U.S. Department of Transportation, and FTA. The Recipient acknowledges that this requirement is neither a waiver of § 70914(a) nor a finding under § 70914(b).

Separate requirements for rolling stock are set out at 49 U.S.C. 5323(j)(2)(C), 49 U.S.C. § 5323(u) and 49 C.F.R. § 661.11. Domestic preferences for procurements

The bidder or offeror must submit to the Agency the appropriate Buy America certification. Bids or offers that are not accompanied by a completed Buy America certification will be rejected as nonresponsive. For more information please see the FTA's Buy America webpage at: https://www.transit.dot.gov/buyamerica

## CARGO PREFERENCE REQUIREMENTS

The contractor agrees:
a. to use privately owned United States-Flag commercial vessels to ship at least 50 percent of the gross tonnage (computed separately for dry bulk carriers, dry cargo liners, and tankers) involved, whenever shipping any equipment, material, or commodities pursuant to the underlying contract to the extent such vessels are available at fair and reasonable rates for United States-Flag commercial vessels;

b. to furnish within 20 working days following the date of loading for shipments originating within the United States or within 30 working days following the date of loading for shipments originating outside the United States, a legible copy of a rated, "on-board" commercial ocean bill-of-lading in English for each shipment of cargo described in the preceding paragraph to the Division of National Cargo, Office of Market Development, Maritime Administration, Washington, DC 20590 and to the FTA Recipient (through the contractor in the case of a subcontractor's bill-of-lading.); and

c. to include these requirements in all subcontracts issued pursuant to this contract when the subcontract may involve the transport of equipment, material, or commodities by ocean vessel.

## CHANGES TO FEDERAL REQUIREMENTS

Federal requirements that apply to the Recipient or the Award, the accompanying Underlying Agreement, and any Amendments thereto may change due to changes in federal law, regulation, other requirements, or guidance, or changes in the Recipient's Underlying Agreement including any information incorporated by reference and made part of that Underlying Agreement; and

Applicable changes to those federal requirements will apply to each Third Party Agreement and parties thereto at any tier.

## CIVIL RIGHTS LAWS AND REGULATIONS

The following Federal Civil Rights laws and regulations apply to all contracts.

The Contractor and any subcontractor agree to comply with all the requirements prohibiting discrimination on the basis of race, color, or national origin of the

Docusign Envelope ID: E9249547-8E47-4502-9CP6-2E5212073368

Page 4 of 11 the Civil Rights Action of 1964, as amended 52 U.S.C 2000d, and U.S. DOT regulation "Nondiscrimination in Federally-Assisted Programs of the
Department of Transportation – Effectuation of the Title VI of the Civil rights Act, "49 C.F. R. Part 21 and any implementing requirement FTA may issue.

**1 Federal Equal Employment Opportunity (EEO) Requirements.** These include, but are not limited to:

a) Nondiscrimination in Federal Public Transportation Programs. 49 U.S.C. § 5332, covering projects, programs, and activities financed under 49 U.S.C.
Chapter 53, prohibits discrimination on the basis of race, color, religion, national origin, sex (including sexual orientation and gender identity), disability, or
age, and prohibits discrimination in employment or business opportunity.

b) Prohibition against Employment Discrimination. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, and Executive Order No. 11246,
"Equal Employment Opportunity," September 24, 1965, as amended, prohibit discrimination in employment on the basis of race, color, religion, sex, or
national origin.

**2 Nondiscrimination on the Basis of Sex.** Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. § 1681 et seq. and implementing
Federal regulations, "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance," 49 C.F.R. part 25
prohibit discrimination on the basis of sex.

**3 Nondiscrimination on the Basis of Age.** The "Age Discrimination Act of 1975," as amended, 42 U.S.C. § 6101 et seq., and Department of Health and
Human Services implementing regulations, "Nondiscrimination on the Basis of Age in Programs or Activities Receiving Federal Financial Assistance," 45
C.F.R. part 90, prohibit discrimination by participants in federally assisted programs against individuals on the basis of age. The Age Discrimination in
Employment Act (ADEA), 29 U.S.C. § 621 et seq., and Equal Employment Opportunity Commission (EEOC) implementing regulations, "Age Discrimination
in Employment Act," 29 C.F.R. part 1625, also prohibit employment discrimination against individuals age 40 and over on the basis of age.

**4 Federal Protections for Individuals with Disabilities.** The Americans with Disabilities Act of 1990, as amended (ADA), 42 U.S.C. § 12101 et seq.,
prohibits discrimination against qualified individuals with disabilities in programs, activities, and services, and imposes specific requirements on public and
private entities. Third party contractors must comply with their responsibilities under Titles I, II, III, IV, and V of the ADA in employment, public services, public
accommodations, telecommunications, and other provisions, many of which are subject to regulations issued by other Federal agencies.

**Civil Rights and Equal Opportunity**
The Agency is an Equal Opportunity Employer. As such, the Agency agrees to comply with all applicable Federal civil rights laws and implementing
regulations. Apart from inconsistent requirements imposed by Federal laws or regulations, the Agency agrees to comply with the requirements of 49 U.S.C.
§ 5323(h) (3) by not using any Federal assistance awarded by FTA to support procurements using exclusionary or discriminatory specifications. Under this
Contract, the Contractor shall at all times comply with the following requirements and shall include these requirements in each subcontract entered into as
part thereof.

**1. Nondiscrimination.** In accordance with Federal transit law at 49 U.S.C. § 5332, the Contractor agrees that it will not discriminate against any employee
or applicant for employment because of race, color, religion, national origin, sex, disability, or age. In addition, the Contractor agrees to comply with
applicable Federal implementing regulations and other implementing requirements FTA may issue.

**2. Race, Color, Religion, National Origin, Sex.** In accordance with Title VII of the Civil Rights Act, as amended, 42 U.S.C. § 2000e et seq., and Federal
transit laws at 49 U.S.C. § 5332, the Contractor agrees to comply with all applicable equal employment opportunity requirements of U.S. Department of
Labor (U.S. DOL) regulations, "Office of Federal Contract Compliance Programs, Equal Employment Opportunity, Department of Labor," 41 C.F.R. chapter
60, and Executive Order No. 11246, "Equal Employment Opportunity in Federal Employment," September 24, 1965, 42 U.S.C. § 2000e note, as amended by
any later Executive Order that amends or supersedes it, referenced in 42 U.S.C. § 2000e note. The Contractor agrees to take affirmative action to ensure
that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, national origin, or sex (including
sexual orientation and gender identity). Such action shall include, but not be limited to, the following: employment, promotion, demotion or transfer,
recruitment or recruitment advertising, layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship.
In addition, the Contractor agrees to comply with any implementing requirements FTA may issue.

**3. Age.** In accordance with the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-634, U.S. Equal Employment Opportunity Commission (U.S.
EEOC) regulations, "Age Discrimination in Employment Act," 29 C.F.R. part 1625, the Age Discrimination Act of 1975, as amended, 42 U.S.C. § 6101 et
seq., U.S. Health and Human Services regulations, "Nondiscrimination on the Basis of Age in Programs or Activities Receiving Federal Financial
Assistance," 45 C.F.R. part 90, and Federal transit law at 49 U.S.C. § 5332, the Contractor agrees to refrain from discrimination against present and
prospective employees for reason of age. In addition, the Contractor agrees to comply with any Implementing requirements FTA may issue.

**4.Disabilities.** In accordance with section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794, the Americans with Disabilities Act of 1990,
as amended, 42 U.S.C. § 12101 et seq., the Architectural Barriers Act of 1968, as amended, 42 U.S.C. § 4151 et seq., and Federal transit law at 49 U.S.C. §
5332, the Contractor agrees that it will not discriminate against individuals on the basis of disability. In addition, the Contractor agrees to comply with any
implementing requirements FTA may issue.

**5.Promoting Free Speech and Religious Liberty.** The Contractor shall ensure that Federal funding is expended in full accordance with the U.S.
Constitution, Federal Law, and statutory and public policy requirements: including, but not limited to, those protecting free speech, religious liberty, public
welfare, the environment, and prohibiting discrimination.

# CLEAN AIR ACT AND FEDERAL WATER POLLUTION CONTROL ACT

The Contractor agrees to comply with all applicable standards, orders, or regulations issued pursuant to the Clean Air Act (42 U.S.C. § 7401-7671q) and the
Federal Water Pollution Control Act as amended (33 U.S.C. § 1251-1387). Violations must be reported to FTA and the Regional Office of the Environmental
Protection Agency. The following applies for contracts of amounts in excess of $150,000:

Clean Air Act

(1) The contractor agrees to comply with all applicable standards, orders or regulations issued pursuant to the Clean Air Act, as amended, 42 U.S.C. § 7401
et seq.

(2) The contractor agrees to report each violation to the Agency and understands and agrees that the Agency will, in turn, report each violation as required to
assure notification to the Agency, Federal Emergency Management Agency, and the appropriate Environmental Protection Agency Regional Office.

(3) The contractor agrees to include these requirements in each subcontract exceeding $150,000 financed in whole or in part with Federal assistance
provided by FTA.

Federal Water Pollution Control Act

(1) The contractor agrees to comply with all applicable standards, orders or regulations issued pursuant to the Federal Water Pollution Control Act, as amended, 33 U.S.C. 1251 et seq.

(2) The contractor agrees to report each violation to the Agency and understands and agrees that the Agency will, in turn, report each violation as required to assure notification to the Agency, Federal Emergency Management Agency, and the appropriate Environmental Protection Agency Regional Office.

(3) The contractor agrees to include these requirements in each subcontract exceeding $150,000 financed in whole or in part with Federal assistance provided by FTA."

# DEBARMENT AND SUSPENSION

The Contractor shall comply and facilitate compliance with U.S. DOT regulations, "Nonprocurement Suspension and Debarment," 2 C.F.R. part 1200, which adopts and supplements the U.S. Office of Management and Budget (U.S. OMB) "Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement)," 2 C.F.R. part 180. These provisions apply to each contract at any tier of $25,000 or more, and to each contract at any tier for a federally required audit (irrespective of the contract amount), and to each contract at any tier that must be approved by an FTA official irrespective of the contract amount. As such, the Contractor shall verify that its principals, affiliates, and subcontractors are eligible to participate in this federally funded contract and are not presently declared by any Federal department or agency to be:

a) Debarred from participation in any federally assisted Award;

b) Suspended from participation in any federally assisted Award;

c) Proposed for debarment from participation in any federally assisted Award;

d) Declared ineligible to participate in any federally assisted Award;

e) Voluntarily excluded from participation in any federally assisted Award; or

f) Disqualified from participation in any federally assisted Award.

By signing and submitting its bid or proposal, the bidder or proposer certifies as follows:

The certification in this clause is a material representation of fact relied upon by the AGENCY. If it is later determined by the AGENCY that the bidder or proposer knowingly rendered an erroneous certification, in addition to remedies available to the AGENCY, the Federal Government may pursue available remedies, including but not limited to suspension and/or debarment. The bidder or proposer agrees to comply with the requirements of 2 C.F.R. part 180, subpart C, as supplemented by 2 C.F.R. part 1200, while this offer is valid and throughout the period of any contract that may arise from this offer. The bidder or proposer further agrees to include a provision requiring such compliance in its lower tier covered transactions.

# DISADVANTAGED BUSINESS ENTERPRISE (DBE)

*(Does not apply to projects fully funded by the Tribal Transportation Program (TTP).)*

It is the policy of the Agency and the United States Department of Transportation ("DOT") that Disadvantaged Business Enterprises ("DBE's"), as defined herein and in the Federal regulations published at 49 C.F.R. part 26, shall have an equal opportunity to participate in DOT-assisted contracts.

The contractor or subcontractor shall not discriminate on the basis of race, color, national origin, or sex in the performance of this contract. The contractor shall carry out applicable requirements of 49 C.F.R. part 26 in the award and administration of DOT-assisted contracts. Failure by the contractor to carry out these requirements is a material breach of this contract, which may result in the termination of this contract or such other remedy as the Agency deems appropriate, which may include, but is not limited to:

(1) Withholding monthly progress payments;

(2) Assessing sanctions;

(3) Liquidated damages; and/or

(4) Disqualifying the contractor from future bidding as non-responsible. 49 C.F.R. § 26.13(b).

Prime contractors are required to pay subcontractors for satisfactory performance of their contracts no later than 30 days from receipt of each payment the Agency makes to the prime contractor. 49 C.F.R. § 26.29(a).

Finally, for contracts with defined DBE contract goals, the contractor shall utilize the specific DBEs listed unless the contractor obtains the Agency's written consent; and that, unless the Agency's consent is provided, the contractor shall not be entitled to any payment for work or material unless it is performed or supplied by the listed DBE. 49 C.F.R. § 26.53(f) (1).

# ENERGY CONSERVATION

The contractor agrees to comply with mandatory standards and policies relating to energy efficiency, which are contained in the state energy conservation plan issued in compliance with the Energy Policy and Conservation Act (42 U.S.C.§ 6201).

# EQUAL EMPLOYMENT OPPORTUNITY

During the performance of this contract, the contractor agrees as follows:

(1) The contractor will not discriminate against any employee or applicant for employment because of race, color, religion, sex, sexual orientation, gender identity, or national origin. The contractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex, sexual orientation, gender identity, or national origin. Such action shall include, but not be limited to the following: Employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of this nondiscrimination clause.

(2) The contractor will, in all solicitations or advertisements for employees placed by or on behalf of the contractor, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex, sexual orientation, gender identity, or national origin.

(3) The contractor will not discharge or in any other manner discriminate against any employee or applicant for employment because such employee or applicant has inquired about, discussed, or disclosed the compensation of the employee or applicant or another employee or applicant. This provision shall not apply to instances in which an employee who has access to the compensation information of other employees or applicants as a part of such employee's essential job functions discloses the compensation of such other employees or applicants to individuals who do not otherwise have access to such information, unless such disclosure is in response to a formal complaint or charge, in furtherance of an investigation, proceeding, hearing, or action,

in aid of an investigation conducted by the employer, or is consistent with the contractor's legal duty to furnish information.

(4) The contractor will send to each labor union or representative of workers with which it has a collective bargaining agreement or other contract or understanding, a notice to be provided by the agency contracting officer, advising the labor union or workers' representative of the contractor's commitments under section 202 of Executive Order 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(5) The contractor will comply with all provisions of Executive Order 11246 of September 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor.

(6) The contractor will furnish all information and reports required by Executive Order 11246 of September 24, 1965, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records, and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

(7) In the event of the contractor's non-compliance with the nondiscrimination clauses of this contract or with any of such rules, regulations, or orders, this contract may be canceled, terminated or suspended in whole or in part and the contractor may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order 11246 of September 24, 1965, and such other sanctions may be imposed and remedies invoked as provided in Executive Order 11246 of September 24, 1965, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

(8) The contractor will include the provisions of paragraphs (1) through (8) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to section 204 of Executive Order 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. The contractor will take such action with respect to any subcontract or purchase order as may be directed by the Secretary of Labor as a means of enforcing such provisions including sanctions for noncompliance: Provided, however, that in the event the contractor becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction, the contractor may request the United States to enter into such litigation to protect the interests of the United States.

## FLY AMERICA

a) Definitions. As used in this clause—
1) "International air transportation" means transportation by air between a place in the United States and a place outside the United States or between two places both of which are outside the United States. 2) "United States" means the 50 States, the District of Columbia, and outlying areas. 3) "U.S.-flag air carrier" means an air carrier holding a certificate under 49 U.S.C. Chapter 411.

b) When Federal funds are used to fund travel, Section 5 of the International Air Transportation Fair Competitive Practices Act of 1974 (49 U.S.C. 40118) (Fly America Act) requires contractors, Agencys, and others use U.S.-flag air carriers for U.S. Government-financed international air transportation of personnel (and their personal effects) or property, to the extent that service by those carriers is available. It requires the Comptroller General of the United States, in the absence of satisfactory proof of the necessity for foreign-flag air transportation, to disallow expenditures from funds, appropriated or otherwise established for the account of the United States, for international air transportation secured aboard a foreign-flag air carrier if a U.S.-flag air carrier is available to provide such services.

c) If available, the Contractor, in performing work under this contract, shall use U.S.-flag carriers for international air transportation of personnel (and their personal effects) or property.

d) In the event that the Contractor selects a carrier other than a U.S.-flag air carrier for international air transportation, the Contractor shall include a statement on vouchers involving such transportation essentially as follows:

Statement of Unavailability of U.S.-Flag Air Carriers
International air transportation of persons (and their personal effects) or property by U.S.-flag air carrier was not available or it was necessary to use foreign-flag air carrier service for the following reasons. See FAR § 47.403. [State reasons]:

e) Contractor shall include the substance of this clause, including this paragraph (e), in each subcontract or purchase under this contract that may involve international air transportation.

## INCORPORATION OF FEDERAL TRANSIT ADMINISTRATION (FTA) TERMS

The provisions within include, in part, certain Standard Terms and Conditions required under the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards (2 CFR § 200), whether or not expressly set forth in the preceding contract provisions. All contractual provisions required by DOT, detailed in 2 CFR § 200 or as amended by 2 CFR § 1201, or the most recent version of FTA Circular 4220.1 are hereby incorporated by reference. Anything to the contrary herein notwithstanding, all mandated terms shall be deemed to control in the event of a conflict with other provisions contained in this Contract. The Contractor shall not perform any act, fail to perform any act, or refuse to comply with any request which would cause a violation of the FTA terms and conditions.

## NO GOVERNMENT OBLIGATION TO THIRD PARTIES

The Recipient and Contractor acknowledge and agree that, notwithstanding any concurrence by the Federal Government in or approval of the solicitation or award of the underlying Contract, absent the express written consent by the Federal Government, the Federal Government is not a party to this Contract and shall not be subject to any obligations or liabilities to the Recipient, Contractor or any other party (whether or not a party to that contract) pertaining to any matter resulting from the underlying Contract. The Contractor agrees to include the above clause in each subcontract financed in whole or in part with Federal assistance provided by the FTA. It is further agreed that the clause shall not be modified, except to identify the subcontractor who will be subject to its provisions.

## NOTICE TO FTA AND U.S. DOT INSPECTOR GENERAL OF INFORMATION RELATED TO FRAUD, WASTE, ABUSE, OR OTHER LEGAL MATTERS

If a current or prospective legal matter that may affect the Federal Government emerges, the Recipient must promptly notify the FTA Chief Counsel and FTA Regional Counsel for the Region in which the Recipient is located. The Recipient must include a similar notification requirement in its Third Party Agreements and must require each Third Party Participant to include an equivalent provision in its subagreements at every tier, for any agreement that is a "covered transaction" according to 2 C.F.R. §§ 180.220 and 1200.220.

(1) The types of legal matters that require notification include, but are not limited to, a major dispute, breach, default, litigation, or naming the Federal Government as a party to litigation or a legal disagreement in any forum for any reason.

(2) Matters that may affect the Federal Government include, but are not limited to, the Federal Government's interests in the Award, the accompanying Underlying Agreement, and any Amendments thereto, or the Federal Government's administration or enforcement of federal laws, regulations, and requirements.

(3) The Recipient must promptly notify the U.S. DOT Inspector General in addition to the FTA Chief Counsel or Regional Counsel for the Region in which the Recipient is located, if the Recipient has knowledge of potential fraud, waste, or abuse occurring on a Project receiving assistance from FTA. The notification provision applies if a person has or may have submitted a false claim under the False Claims Act, 31 U.S.C. § 3729 et seq., or has or may have committed a criminal or civil violation of law pertaining to such matters as fraud, conflict of interest, bribery, gratuity, or similar misconduct. This responsibility occurs whether the Project is subject to this Agreement or another agreement between the Recipient and FTA, or an agreement involving a principal, officer, employee, agent, or Third Party Participant of the Recipient. It also applies to subcontractors at any tier. Knowledge, as used in this paragraph, includes, but is not limited to, knowledge of a criminal or civil investigation by a Federal, state, or local law enforcement or other investigative agency, a criminal indictment or civil complaint, or probable cause that could support a criminal indictment, or any other credible information in the possession of the Recipient.

## PROGRAM FRAUD AND FALSE OR FRAUDULENT STATEMENTS AND RELATED ACTS

The Contractor acknowledges that the provisions of the Program Fraud Civil Remedies Act of 1986, as amended, 31 U.S.C. § 3801 et seq. and U.S. DOT regulations, "Program Fraud Civil Remedies," 49 C.F.R. part 31, apply to its actions pertaining to this Project. Upon execution of the underlying contract, the Contractor certifies or affirms the truthfulness and accuracy of any statement it has made, it makes, it may make, or causes to be made, pertaining to the underlying contract or the FTA assisted project for which this contract work is being performed. In addition to other penalties that may be applicable, the Contractor further acknowledges that if it makes, or causes to be made, a false, fictitious, or fraudulent claim, statement, submission, or certification, the Federal Government reserves the right to impose the penalties of the Program Fraud Civil Remedies Act of 1986 on the Contractor to the extent the Federal Government deems appropriate.

The Contractor also acknowledges that if it makes, or causes to be made, a false, fictitious, or fraudulent claim, statement, submission, or certification to the Federal Government under a contract connected with a project that is financed in whole or in part with Federal assistance originally awarded by FTA under the authority of 49 U.S.C. chapter 53, the Government reserves the right to impose the penalties of 18 U.S.C. § 1001 and 49 U.S.C. § 5323(l) on the Contractor, to the extent the Federal Government deems appropriate.

The Contractor agrees to include the above two clauses in each subcontract financed in whole or in part with Federal assistance provided by FTA. It is further agreed that the clauses shall not be modified, except to identify the subcontractor who will be subject to the provisions.

# PROHIBITION ON CERTAIN TELECOMMUNICATIONS AND VIDEO SURVEILLANCE SERVICES OR EQUIPMENT.

a. Recipients and subrecipients are prohibited from obligating or expending loan or grant funds to:

1. Procure or obtain;

2. Extend or renew a contract to procure or obtain;or

3. Enter into a contract (or extend or renew a contract) to procure or obtain equipment, services, or systems that uses covered telecommunications equipment or services as a substantial or essential component of any system, or as critical technology as part of any system. As described in Public Law 115-232, section 889, covered telecommunications equipment is telecommunications equipment produced by Huawei Technologies Company or ZTE Corporation (or any subsidiary or affiliate of such entities).

    i. For the purpose of public saftey, security of government facilities, physical security surveillance of critical infrastructure, and other national security purposes, video surveillance and telecommunications equipment produced by Hytera Communications Corporation, Hangzhou Hikvision Digital Technology Company, or Dahua Technology Company(or any subsidiary or affiliate of such entities).

    ii. Telecommunications or video surveillance services provided by such entities or using such equipment.

    iii. Telecommunications or video surveillance equipment or services procuced or provided by an entity that the Secretary of Defense, in consultation with the Director of the National Intelligence or the Director of the Federal Bureau of Investigation, reasonably believes to be an entity owned or controlled by, or otherwise connected to, the government of a covered foreign country.

b. In implementing the prohibition under Public Law 115-232, section 889, subsection (f), paragraph (1), heads of executive agencies administering loan, grant, or subsidy programs shall prioritize available funding and technical support to assist affected businesses, institutions and organizations as is reasonably necessary for those affected entities to transition from covered communications equipment and services, to procure replacement equipment and services, and to ensure that communications service to users and customers is sustained.

c. See Public Law 115-232,section 889 for additional in formation.

d. See also § 200.471.

# PROMPT PAYMENT

*(Does not apply to projects fully funded by the Tribal Transportation Program (TTP).)*

The contractor is required to pay its subcontractors performing work related to this contract for satisfactory performance of that work no later than 30 days after the contractor's receipt of payment for that work. In addition, the contractor is required to return any retainage payments to those subcontractors within 30 days after the subcontractor's work related to this contract is satisfactorily completed.

The contractor must promptly notify the Agency, whenever a DBE subcontractor performing work related to this contract is terminated or fails to complete its work and must make good faith efforts to engage another DBE subcontractor to perform at least the same amount of work. The contractor may not terminate any DBE subcontractor and perform that work through its own forces or those of an affiliate without prior written consent of the Agency.

# RESTRICTIONS ON LOBBYING

**Conditions on use of funds.**

(a) No appropriated funds may be expended by the recipient of a Federal contract, grant, loan, or cooperative agreement to pay any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with any of the following covered Federal actions: the awarding of any Federal contract, the making of any Federal grant, the making of any Federal loan, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement.

(b) Each person who requests or receives from an agency a Federal contract, grant, loan, or cooperative agreement shall file with that agency a certification, that the person has not made, and will not make, any payment prohibited by paragraph (a) of this section.

(c) Each person who requests or receives from an agency a Federal contract, grant, loan, or a cooperative agreement shall file with that agency a disclosure form if such person has made or has agreed to make any payment using nonappropriated funds (to include profits from any covered Federal action), which would be prohibited under paragraph (a) of this section if paid for with appropriated funds.

(d) Each person who requests or receives from an agency a commitment providing for the United States to insure or guarantee a loan shall file with that agency a statement, whether that person has made or has agreed to make any payment to influence or attempt to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with that loan insurance or guarantee.

(e) Each person who requests or receives from an agency a commitment providing for the United States to insure or guarantee a loan shall file with that agency a disclosure form if that person has made or has agreed to make any payment to influence or attempt to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with that loan insurance or guarantee.

**Certification and disclosure.**

(a) Each person shall file a certification, and a disclosure form, if required, with each submission that initiates agency consideration of such person for:

(1) Award of a Federal contract, grant, or cooperative agreement exceeding $100,000; or

(2) An award of a Federal loan or a commitment providing for the United States to insure or guarantee a loan exceeding $150,000.

(b) Each person shall file a certification, and a disclosure form, if required, upon receipt by such person of:

(1) A Federal contract, grant, or cooperative agreement exceeding $100,000; or

(2) A Federal loan or a commitment providing for the United States to insure or guarantee a loan exceeding $150,000,

**Unless such person previously filed a certification, and a disclosure form, if required, under paragraph (a) of this section.**

(c) Each person shall file a disclosure form at the end of each calendar quarter in which there occurs any event that requires disclosure or that materially affects the accuracy of the information contained in any disclosure form previously filed by such person under paragraphs (a) or (b) of this section. An event that materially affects the accuracy of the information reported includes:

(1) A cumulative increase of $25,000 or more in the amount paid or expected to be paid for influencing or attempting to influence a covered Federal action; or

(2) A change in the person(s) or individual(s) influencing or attempting to influence a covered Federal action; or,

(3) A change in the officer(s), employee(s), or Member(s) contacted to influence or attempt to influence a covered Federal action.

(d) Any person who requests or receives from a person referred to in paragraphs (a) or (b) of this section:

(1) A subcontract exceeding $100,000 at any tier under a Federal contract;

(2) A subgrant, contract, or subcontract exceeding $100,000 at any tier under a Federal grant;

(3) A contract or subcontract exceeding $100,000 at any tier under a Federal loan exceeding $150,000; or,

(4) A contract or subcontract exceeding $100,000 at any tier under a Federal cooperative agreement,

**Shall file a certification, and a disclosure form, if required, to the next tier above.**

(e) All disclosure forms, but not certifications, shall be forwarded from tier to tier until received by the person referred to in paragraphs (a) or (b) of this section. That person shall forward all disclosure forms to the agency.

(f) Any certification or disclosure form filed under paragraph (e) of this section shall be treated as a material representation of fact upon which all receiving tiers shall rely. All liability arising from an erroneous representation shall be borne solely by the tier filing that representation and shall not be shared by any tier to which the erroneous representation is forwarded. Submitting an erroneous certification or disclosure constitutes a failure to file the required certification or disclosure, respectively. If a person fails to file a required certification or disclosure, the United States may pursue all available remedies, including those authorized by section 1352, title 31, U.S. Code.

(g) For awards and commitments in process prior to December 23, 1989, but not made before that date, certifications shall be required at award or commitment, covering activities occurring between December 23, 1989, and the date of award or commitment. However, for awards and commitments in process prior to the December 23, 1989 effective date of these provisions, but not made before December 23, 1989, disclosure forms shall not be required at time of award or commitment but shall be filed within 30 days.

(h) No reporting is required for an activity paid for with appropriated funds if that activity is allowable under either subpart B or C.

## SAFE OPERATION OF MOTOR VEHICLES

**Seat Belt Use**
The Contractor is encouraged to adopt and promote on-the-job seat belt use policies and programs for its employees and other personnel that operate company-owned vehicles, company rented vehicles, or personally operated vehicles. The terms "company-owned" and "company-leased" refer to vehicles owned or leased either by the Contractor or Agency.

**Distracted Driving**
The Contractor agrees to adopt and enforce workplace safety policies to decrease crashes caused by distracted drivers, including policies to ban text messaging while using an electronic device supplied by an employer, and driving a vehicle the driver owns or rents, a vehicle Contactor owns, leases, or rents, or a privately-owned vehicle when on official business in connection with the work performed under this Contract.

## SIMPLIFIED ACQUISITION THRESHOLD

Contracts for more than the simplified acquisition threshold, which is the inflation adjusted amount determined by the Civilian Agency Acquisition Council and the Defense Acquisition Regulations Council (Councils) as authorized by 41 U.S.C. § 1908, or otherwise set by law, must address administrative, contractual, or legal remedies in instances where contractors violate or breach contract terms, and provide for such sanctions and penalties as appropriate. (Note that the simplified acquisition threshold determines the procurement procedures that must be employed pursuant to 2 C.F.R. §§ 200.317–200.327. The simplified acquisition threshold does not exempt a procurement from other eligibility or processes requirements that may apply. For example, Buy America's eligibility and process requirements apply to any procurement in excess of $150,000. 49 U.S.C. § 5323(j)(13).

## SOLID WASTES (RECOVERED MATERIALS)

A Recipient that is a state agency or agency of a political subdivision of a state and its contractors must comply with section 6002 of the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act. The requirements of Section 6002 include procuring only items designated in guidelines of the Environmental Protection Agency (EPA) at 40 CFR Part 247 that contain the highest percentage of recovered materials practicable, consistent with maintaining a satisfactory level of competition, where the purchase price of the item exceeds $10,000 or the value of the quantity acquired during the preceding fiscal year exceeded $10,000; procuring solid waste management services in a manner that maximizes energy and resource recovery; and establishing an affirmative procurement program for procurement of recovered materials identified in the EPA guidelines.

## SPECIAL NOTIFICATION REQUIREMENTS FOR STATES

Applies to States –

a. To the extent required under federal law, the State, as the Recipient, agrees to provide the following information about federal assistance awarded for its State Program, Project, or related activities:

    (1) The Identification of FTA as the federal agency providing the federal assistance for a State Program or Project;
    (2) The Catalog of Federal Domestic Assistance Number of the program from which the federal assistance for a State Program or Project is authorized; and
    (3) The amount of federal assistance FTA has provided for a State Program or Project.

b. Documents - The State agrees to provide the information required under this provision in the following documents:

    (1) applications for federal assistance,
    (2) requests for proposals or solicitations,
    (3) forms,
    (4) notifications,
    (5) press releases,
    (6) other publications.

# TERMINATION

### Termination for Convenience (General Provision)
The Agency may terminate this contract, in whole or in part, at any time by written notice to the Contractor when it is in the Agency's best interest. The Contractor shall be paid its costs, including contract close-out costs, and profit on work performed up to the time of termination. The Contractor shall promptly submit its termination claim to Agency to be paid the Contractor. If the Contractor has any property in its possession belonging to Agency, the Contractor will account for the same, and dispose of it in the manner Agency directs.

### Termination for Default [Breach or Cause] (General Provision)
If the Contractor does not deliver supplies in accordance with the contract delivery schedule, or if the contract is for services, the Contractor fails to perform in the manner called for in the contract, or if the Contractor fails to comply with any other provisions of the contract, the Agency may terminate this contract for default. Termination shall be effected by serving a Notice of Termination on the Contractor setting forth the manner in which the Contractor is in default. The Contractor will be paid only the contract price for supplies delivered and accepted, or services performed in accordance with the manner of performance set forth in the contract. If it is later determined by the Agency that the Contractor had an excusable reason for not performing, such as a strike, fire, or flood, events which are not the fault of or are beyond the control of the Contractor, the Agency, after setting up a new delivery of performance schedule, may allow the Contractor to continue work, or treat the termination as a Termination for Convenience.

### Opportunity to Cure (General Provision)
The Agency, in its sole discretion may, in the case of a termination for breach or default, allow the Contractor [an appropriately short period of time] in which to cure the defect. In such case, the Notice of Termination will state the time period in which cure is permitted and other appropriate conditions

If Contractor fails to remedy to Agency's satisfaction the breach or default of any of the terms, covenants, or conditions of this Contract within [10 days] after receipt by Contractor of written notice from Agency setting forth the nature of said breach or default, Agency shall have the right to terminate the contract without any further obligation to Contractor. Any such termination for default shall not in any way operate to preclude Agency from also pursuing all available remedies against Contractor and its sureties for said breach or default.

### Waiver of Remedies for any Breach
In the event that Agency elects to waive its remedies for any breach by Contractor of any covenant, term or condition of this contract, such waiver by Agency shall not limit Agency's remedies for any succeeding breach of that or of any other covenant, term, or condition of this contract.

### Termination for Convenience (Professional or Transit Service Contracts)
The Agency, by written notice, may terminate this contract, in whole or in part, when it is in the Agency's interest. If this contract is terminated, the Agency shall be liable only for payment under the payment provisions of this contract for services rendered before the effective date of termination.

### Termination for Default (Supplies and Service)
If the Contractor fails to deliver supplies or to perform the services within the time specified in this contract or any extension, or if the Contractor fails to comply with any other provisions of this contract, the Agency may terminate this contract for default. The Agency shall terminate by delivering to the Contractor a Notice of Termination specifying the nature of the default. The Contractor will only be paid the contract price for supplies delivered and accepted, or services performed in accordance with the manner or performance set forth in this contract. If, after termination for failure to fulfill contract obligations, it is determined that the Contractor was not in default, the rights and obligations of the parties shall be the same as if the termination had been issued for the convenience of the Agency.

### Termination for Default (Transportation Services)
If the Contractor fails to pick up the commodities or to perform the services, including delivery services, within the time specified in this contract or any extension, or if the Contractor fails to comply with any other provisions of this contract, the Agency may terminate this contract for default. The Agency shall terminate by delivering to the Contractor a Notice of Termination specifying the nature of default. The Contractor will only be paid the contract price for services performed in accordance with the manner of performance set forth in this contract.

If this contract is terminated while the Contractor has possession of Agency goods, the Contractor shall, upon direction of the Agency, protect and preserve the goods until surrendered to the Agency or its agent. The Contractor and Agency shall agree on payment for the preservation and protection of goods. Failure to agree on an amount will be resolved under the Dispute clause.

If, after termination for failure to fulfill contract obligations, it is determined that the Contractor was not in default, the rights and obligations of the parties shall be the same as if the termination had been issued for the convenience of the Agency.

### Termination for Default (Construction)
If the Contractor refuses or fails to prosecute the work or any separable part, with the diligence that will ensure its completion within the time specified in this contract or any extension or fails to complete the work within this time, or if the Contractor fails to comply with any other provision of this contract, Agency may terminate this contract for default. The Agency shall terminate by delivering to the Contractor a Notice of Termination specifying the nature of the default. In this event, the Agency may take over the work and compete it by contract or otherwise, and may take possession of and use any materials, appliances, and plant on the work site necessary for completing the work. The Contractor and its sureties shall be liable for any damage to the Agency resulting from the Contractor's refusal or failure to complete the work within specified time, whether or not the Contractor's right to proceed with the work is terminated. This liability includes any increased costs incurred by the Agency in completing the work.

The Contractor's right to proceed shall not be terminated nor shall the Contractor be charged with damages under this clause if: 1. The delay in completing the work arises from unforeseeable causes beyond the control and without the fault or negligence of the Contractor. Examples of such causes include: acts of God, acts of Agency, acts of another contractor in the performance of a contract with Agency, epidemics, quarantine restrictions, strikes, freight embargoes; and 2. The Contractor, within [10] days from the beginning of any delay, notifies Agency in writing of the causes of delay. If, in the judgment of Agency, the delay is excusable, the time for completing the work shall be extended. The judgment of Agency shall be final and conclusive for the parties, but subject to appeal under the Disputes clause(s) of this contract. 3. If, after termination of the Contractor's right to proceed, it is determined that the Contractor was not in default, or that the delay was excusable, the rights and obligations of the parties will be the same as if the termination had been issued for the convenience of Agency.

<u>Termination for Convenience or Default (Architect and Engineering)</u>
The Agency may terminate this contract in whole or in part, for the Agency's convenience or because of the failure of the Contractor to fulfill the contract obligations. The Agency shall terminate by delivering to the Contractor a Notice of Termination specifying the nature, extent, and effective date of the termination. Upon receipt of the notice, the Contractor shall (1) immediately discontinue all services affected (unless the notice directs otherwise), and (2) deliver to the Agency 's Contracting Officer all data, drawings, specifications, reports, estimates, summaries, and other information and materials accumulated in performing this contract, whether completed or in process. Agency has a royalty-free, nonexclusive, and irrevocable license to reproduce, publish or otherwise use, all such data, drawings, specifications, reports, estimates, summaries, and other information and materials.

If the termination is for the convenience of the Agency, the Agency's Contracting Officer shall make an equitable adjustment in the contract price but shall allow no anticipated profit on unperformed services.

If the termination is for failure of the Contractor to fulfill the contract obligations, the Agency may complete the work by contact or otherwise and the Contractor shall be liable for any additional cost incurred by the Agency.

If, after termination for failure to fulfill contract obligations, it is determined that the Contractor was not in default, the rights and obligations of the parties shall be the same as if the termination had been issued for the convenience of Agency

<u>Termination for Convenience or Default (Cost-Type Contracts)</u>
The Agency may terminate this contract, or any portion of it, by serving a Notice of Termination on the Contractor. The notice shall state whether the termination is for convenience of Agency or for the default of the Contractor. If the termination is for default, the notice shall state the manner in which the Contractor has failed to perform the requirements of the contract. The Contractor shall account for any property in its possession paid for from funds received from the Agency, or property supplied to the Contractor by the Agency. If the termination is for default, the Agency may fix the fee, if the contract provides for a fee, to be paid the Contractor in proportion to the value, if any, of work performed up to the time of termination. The Contractor promptly submit its termination claim to the Agency and the parties shall negotiate the termination settlement to be paid the Contractor.

If the termination is for the convenience of Agency, the Contractor shall be paid its contract close-out costs, and a fee, if the contract provided for payment of a fee, in proportion to the work performed up to the time of termination.

If, after serving a Notice of Termination for Default, the Agency determines that the Contractor has an excusable reason for not performing, the Agency, after setting up a new work schedule, may allow the Contractor to continue work, or treat the termination as a Termination for Convenience.

# VIOLATION AND BREACH OF CONTRACT

**Disputes:**
Disputes arising in the performance of this Contract that are not resolved by agreement of the parties shall be decided in writing by the authorized representative of the agency. This decision shall be final and conclusive unless within [10] days of the receipt of its copy, the Contractor mails or otherwise furnishes a written appeal to the agencies authorized representative. In connection with any such appeal, the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its position. The decision of the agencies authorized representative shall be binding upon the Contractor and the Contractor shall abide be the decision.

**Performance during Dispute:**
Unless otherwise directed by the agencies authorized representative, contractor shall continue performance under this contract while matters in dispute are being resolved.

**Claims for Damages:**
Should either party to the contract suffer injury or damage to person or property because of any act or omission of the party or of any of his employees, agents or others for whose acts he is legally liable, a claim for damages therefore shall be made in writing to such other party within a reasonable time after the first observance of such injury or damage.

**Remedies:**
Unless this contract provides otherwise, all claims, counterclaims, disputes and other matters in question between the agencies authorized representative and contractor arising out of or relating to this agreement or its breach will be decided by arbitration if the parties mutually agree, or in a court of competent jurisdiction within the State in which the Agency is located.

**Rights and Remedies:**
Duties and obligations imposed by the contract documents and the rights and remedies available thereunder shall be in addition to and not a limitation of any duties, obligations, rights and remedies otherwise imposed or available by law. No action or failure to act by the Agency or contractor shall constitute a waiver of any right or duty afforded any of them under the contract, nor shall any such action or failure to act constitute an approval of or acquiescence in any breach thereunder, except as may be specifically agreed in writing.

## **OTHER RECOMMENDED CONTRACT REQUIREMENTS**

# CONFORMANCE WITH ITS NATIONAL ARCHITECTURE

Intelligent Transportation Systems (ITS) projects shall conform to the National ITS Architecture and standards pursuant to 23 CFR § 940. Conformance with the National ITS Architecture is interpreted to mean the use of the National ITS Architecture to develop a regional ITS architecture in support of integration and the subsequent adherence of all ITS projects to that regional ITS architecture. Development of the regional ITS architecture should be consistent with the transportation planning process for Statewide and Metropolitan Transportation Planning (49 CFR Part 613 and 621).

## FEDERAL TAX LIABILITY AND RECENT FELONY CONVICTIONS

(1) The contractor certifies that it:

(a) Does not have any unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability; and

(b) Was not convicted of the felony criminal violation under any Federal law within the preceding 24 months.

If the contractor cannot so certify, the Recipient will refer the matter to FTA and not enter into any Third Party Agreement with the Third Party Participant without FTA's written approval.

(2) Flow-Down. The Recipient agrees to require the contractor to flow this requirement down to participants at all lower tiers, without regard to the value of any subagreement.

## SEVERABILITY

The Contractor agrees that if any provision of this agreement or any amendment thereto is determined to be invalid, then the remaining provisions thereof that conform to federal laws, regulations, requirements, and guidance will continue in effect.

## TRAFFICKING IN PERSONS

The contractor agrees that it and its employees that participate in the Recipient's Award, may not:

(a) Engage in severe forms of trafficking in persons during the period of time that the Recipient's Award is in effect;

(b) Procure a commercial sex act during the period of time that the Recipient's Award is in effect; or

(c) Use forced labor in the performance of the Recipient's Award or subagreements thereunder.

## CERTIFICATION AND RESTRICTIONS ON LOBBYING

I, John Mottola, Chief Operating Officer hereby certify

On behalf of Perrone Robotics, Inc. that:

- No federal appropriated funds have been paid or will be paid, by or on behalf of the undersigned, to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, and officer or employee of Congress, or an employee of a Member of Congress in connection with the awarding of any federal contract, the making of any federal grant, the making of any federal loan, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any federal contract, grant, loan, or cooperative agreement.

- If any funds other than federal appropriated funds have been paid or will be paid to any person influencing or attempting to influence an officer or employee of any agency, a Member of Congress, and officer or employee of Congress, or an employee of a Member of Congress in connection with the federal contract, grant, loan, or cooperative agreement, the undersigned shall complete and submit Standard Form – LLL, "Disclosure Form to Report Lobbying," in accordance with its instructions.

- The undersigned shall require that the language of this certification be included in the award documents for all sub-awards at all tiers (including sub-contracts, sub-grants and contracts under grants, loans, and cooperative agreements) and that all sub-recipients shall certify and disclose accordingly.

This certification is a material representation of fact upon which reliance was placed when this transaction was made or entered into. Submission of this certification is a prerequisite for making or entering into this transaction imposed by 31 U.S.C. § 1352. Any person who fails to file the required certification shall be subject to a civil penalty of not less than $10,000 and not more than $100,000 for each such failure.,

Name of Bidder/Company Name: Perrone Robotics, Inc.
Type or print name: John Mottola
Signature of authorized representative: _John Mottola_____ Date 6/10/24

## GOVERNMENT-WIDE DEBARMENT AND SUSPENSION
## (NONPROCUREMENT)

Recipients, contractors, and subcontractors that enter into covered transactions are required to verify that the entity (as well as its principals and affiliates) with which they propose to contract or subcontract is not excluded or disqualified. This is done by: (a) checking the SAM exclusions; (b) collecting a certification from that person (found below); or (c) adding a clause or condition to the contract or subcontract.

**Instructions for Certification:**   Signing below indicates the prospective lower tier participant is providing the signed certification.

(1) It will comply and facilitate compliance with U.S. DOT regulations, "Nonprocurement Suspension and Debarment," 2 CFR part 1200, which adopts and supplements the U.S. Office of Management and Budget (U.S. OMB) "Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement)," 2 CFR part 180,

(2) To the best of its knowledge and belief, that its Principals and Subrecipients at the first tier:

   a. Are eligible to participate in covered transactions of any Federal department or agency and are not presently:

1. Debarred,
2. Suspended,
3. Proposed for debarment,
4. Declared ineligible,
5. Voluntarily excluded, or
6. Disqualified

   b. Its management has not within a three-year period preceding its latest application or proposal been convicted of or had a civil judgment rendered against any of them for:

1. Commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (Federal, State, or local) transaction, or contract under a public transaction,
2. Violation of any Federal or State antitrust statute, or,
3. Commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making any false statement, or receiving stolen property,

   c. It is not presently indicted for, or otherwise criminally or civilly charged by a governmental entity (Federal, State, or local) with commission of any of the offenses listed in the preceding subsection 2.b of this Certification,

   d. It has not had one or more public transactions (Federal, State, or local) terminated for cause or default within a three-year period preceding this Certification,

   e. If, at a later time, it receives any information that contradicts the statements of subsections 2.a – 2.d above, it will promptly provide that information to FTA,

   f. It will treat each lower tier contract or lower tier subcontract under its Project as a covered lower tier contract for purposes of 2 CFR part 1200 and 2 CFR part 180 if it:

1. Equals or exceeds $25,000,
2. Is for audit services, or,
3. Requires the consent of a Federal official, and

   g. It will require that each covered lower tier contractor and subcontractor:

   1. Comply and facilitate compliance with the Federal requirements of 2 CFR parts 180 and 1200, and
   2. Assure that each lower tier participant in its Project is not presently declared by any Federal department or agency to be:

      a. Debarred from participation in its federally funded Project,
      b. Suspended from participation in its federally funded Project,
      c. Proposed for debarment from participation in its federally funded Project,
      d. Declared ineligible to participate in its federally funded Project,
      e. Voluntarily excluded from participation in its federally funded Project, or
      f. Disqualified from participation in its federally funded Project, and

(3) It will provide a written explanation as indicated on a page attached in FTA's TrAMS platform or the Signature Page if it or any of its principals, including any of its first tier Subrecipients or its Third-Party Participants at a lower tier, is unable to certify compliance with the preceding statements in this Certification Group.,

**Certification** Contractor: Perrone Robotics, Inc.
Signature of Authorized Official: *John Mottola*                               Date 6/12/24
Name and Title of Contractor's Authorized Official: John Mottola, CCO

# BUY AMERICA CERTIFICATION
## STEEL OR MANUFACTURED PRODUCTS

If steel, iron, or manufactured products (as defined in 49 CFR 661.3 and 661.5) are being procured, the appropriate certificate as set forth below shall be completed and submitted by each bidder or offeror in accordance with the requirement contained in 49 CFR 661.13(b).

**Certificate of Compliance with Buy America Requirements**

The bidder or offeror hereby certifies that it will comply with the requirements of 49 U.S.C. 5323(j)(1), and the applicable regulations in 49 CFR part 661.

Company: Perrone Robotics, Inc.

Name  John Mottola

Title  COO

Signature  *John Mottola*

Date :6/12/24

**Certificate of Non-Compliance with Buy America Steel or Manufactured Products Requirements**

The bidder or offeror hereby certifies that it cannot comply with the requirements of 49 U.S.C. 5323(j), but it may qualify for an exception to the requirement pursuant to 49 U.S.C. 5323(j)(2), as amended, and the applicable regulations in 49 C.F.R. 661.7.

Company _____

Name _____  Title _____

Signature _____  Date _____